# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ECP PROPERTY II LLC,                                          :
                                                             :       **AMENDED COMPLAINT**
                                    **Plaintiff,**            :
                                                             :       **14-CV-7298 (FB) (VVP)**
                           **-against-**                     :
                                                             :
JOSEPH NORTON                                                :
                                                             :
and                                                          :
                                                             :
THEMA NORTON,                                                :
                                                             :
                                    **Defendants.**          :

-------------------------------------------------------------X


## AMENDED COMPLAINT

Plaintiff, ECP Property II LLC, by undersigned counsel, complaining of the defendants, Joseph Norton and Thema Norton, alleges as follows:

## THE PARTIES

1.      ECP Property II LLC ("ECP") is a Delaware limited liability company that has its principal place of business at 383 Inverness Parkway, Suite 390, Englewood, Colorado 80112. The sole member of ECP is a citizen of Delaware for diversity purposes.

2.      Joseph Norton is an individual residing at 771 Thomas S. Boyland Street, Brooklyn, New York 11212.

3.      Thema Norton is an individual residing at 771 Thomas S. Boyland Street, Brooklyn, New York 11212.  Ms. Norton is the sole owner of Borrower (defined below).

## VENUE

4.      Venue of this action is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391, as Mr. Norton consented to jurisdiction in the Eastern District of New York and resides in the Eastern District of New York, and a substantial part of the events giving rise to ECP's claims against Ms. Norton occurred in the Eastern District of New York.

## JURISDICTION

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 on the grounds that this civil action constitutes a controversy between citizens of different states and the amount in controversy exceeds $75,000.00.

## FACTUAL ALLEGATIONS

**The Building Loan**

6.      On August 20, 2008, Riverrock Nehemiah Realty LLC ("Borrower") and Banco Popular North America ("Banco Popular") entered into a Building Loan Agreement (the "Building Loan Agreement") and related agreements and documents that established a $1,912,341.00 commercial loan (the "Building Loan") to Borrower and otherwise to reflect certain loan agreements between the parties.  A copy of the Building Loan Agreement is annexed hereto as Exhibit 1.

7.      Borrower and Banco Popular entered into a $1,912,341.00 Building Loan Note (the "Original Building Loan Note") on August 20, 2008 that evidenced the Building Loan.  A copy of the Original Building Loan Note is annexed hereto as Exhibit 2.

8.      The Original Building Loan Note included Borrower's promise to make certain payments to Banco Popular and to perform various other obligations.

9. Borrower subsequently entered into a Building Loan Note Extension and Modification Agreement (the "Building Loan Note Modification Agreement") with Banco Popular on December 8, 2010. Among other things, the Building Loan Note Modification Agreement reduced the principal amount of the Original Building Loan Note to $1,887,583.56 and extended the maturity date of the Original Building Loan Note to March 31, 2011. A copy of the Building Loan Note Modification Agreement is annexed hereto as Exhibit 3.

10. Together, the Original Building Loan Note and the Building Loan Note Modification Agreement are referred to as the "Building Loan Note."

**The Project Loan**

11. Also on August 20, 2008, Borrower and Banco Popular entered into a Project Loan Agreement (the "Project Loan Agreement") and related agreements and documents that established a $349,669.00 commercial loan (the "Project Loan") to Borrower and otherwise to reflect certain loan agreements between the parties. A copy of the Project Loan Agreement is annexed hereto as Exhibit 4.

12. Borrower and Banco Popular entered into a $349,669.00 Project Loan Note (the "Original Project Loan Note") on August 20, 2008 that evidenced the Project Loan. A copy of the Original Project Loan Note is annexed hereto as Exhibit 5.

13. The Original Project Loan Note included Borrower's promise to make certain payments to Banco Popular and to perform various other obligations.

14. Borrower subsequently entered into a Project Loan Note Extension and Modification Agreement (the "Project Loan Note Modification Agreement") with Banco Popular on December 8, 2010. Among other things, the Project Loan Note Modification Agreement reduced the principal amount of the Original Project Loan Note to $97,327.83 and extended the

maturity date of the Original Project Loan Note to March 31, 2011. A copy of the Project Loan Note Modification Agreement is annexed hereto as Exhibit 6.

15.     Also on August 20, 2008, Borrower executed an Assignment of Leases and Rents (the "Assignment of Leases and Rents") in favor of Banco Popular. Among other things, the Assignment of Rents granted to Banco Popular a lien on and security interest in all rents, revenues, income, and other benefits of certain commercial real property and improvements more fully described in the Assignment of Leases and Rents (collectively, the "Property"). A copy of the Assignment of Leases and Rents is annexed hereto as Exhibit 7.

16.     Banco Popular evidenced its interest in the Property, chattels, intangibles, rents, revenues, income and other benefits of the Property, and all proceeds of any of the foregoing, by filing a financing statement with the New York State Secretary of State, which the Secretary of State recorded on October 10, 2008 as filing number 200810100693968. Banco Popular filed a continuation statement with the New York State Secretary of State, which the Secretary of State recorded on May 10, 2013 as filing number 201305105507770. Copies of the financing statement and the continuation statement are annexed hereto collectively as Exhibit 8.

17.     Together, the Original Project Loan Note and the Project Loan Note Modification Agreement are referred to as the "Project Loan Note."

18.     Together, the Building Loan Agreement and the Project Loan Agreement are referred to as the "Loan Agreements."

19.     Together, the Building Loan Note and the Project Loan Note are referred to as the "Notes."

- 4 -

20.     Collectively, the Loan Agreements, the Notes, and all other related documents, instruments and agreements evidencing Borrower's obligations and indebtedness to Banco Popular are referred to as the "Loan Documents."

**Mr. Norton's Guaranty**

21.     By the terms of a Guaranty of Payment dated August 20, 2008 (the "Original Payment Guaranty"), Mr. Norton absolutely and unconditionally guaranteed the performance and payment of Borrower's obligations to Banco Popular.  A copy of the Original Payment Guaranty is annexed hereto as Exhibit 9.

22.     Mr. Norton subsequently executed a December 8, 2010 Reaffirmation of Guaranty of Payment (the "Reaffirmation Guaranty") in favor of Banco Popular, whereby he reaffirmed and ratified the terms and conditions of the Original Payment Guaranty and acknowledged the extensions of the maturity dates of the Building Loan Note and the Project Loan Note.  A copy of the Reaffirmation Guaranty is annexed hereto as Exhibit 10.

23.     Together, the Original Payment Guaranty and the Reaffirmation Guaranty are referred to as the "Guaranty."

**Defaults and Acceleration**

24.     The Notes matured on March 31, 2011 (the "Maturity Date").

25.     Borrower defaulted on its obligations to Banco Popular under the Notes and the Loan Agreements by, among other things, failing to pay Banco Popular all amounts due under the Loan Documents on the Maturity Date.

26.     Banco Popular, through its counsel, notified Borrower of Borrower's default and made demand upon Borrower for payment.  Copies of demand letters from Banco Popular's counsel to Borrower are annexed hereto collectively as Exhibit 11.

27.     Despite demand, Borrower failed and refused to make payment of its outstanding obligations to Banco Popular.

**Banco Popular's Assignment of the Loan Documents to ECP**

28.     By a Loan Purchase and Sale Agreement dated September 3, 2014, Banco Popular assigned to ECP all of Banco Popular's right, title, and interest in and to the Loan Documents and all amounts due thereunder.

29.     Copies of the Allonges to the Building Loan Note and the Project Loan Note are annexed hereto collectively as Exhibit 12.

30.     ECP recorded in the New York City Department of Finance, Office of the City Register, an Assignment of Leases and Rents dated September 22, 2014, assigning the Assignment of Leases and Rents from Banco Popular to ECP.  The City Register recorded the instrument as document number 2014100300379001.  A copy of the recorded instrument is annexed hereto as Exhibit 13.

31.     ECP recorded with the New York Secretary of State and with the New York City Department of Finance, Office of the City Register, financing statement amendments listing ECP as secured party.  The Secretary of State recorded the instruments as document numbers 201410238421579 and 201410238421581, and the City Register recorded the instrument as document number 2014102400685001.  Copies of these recorded instruments are annexed hereto collectively as Exhibit 14.

32.     ECP, through its counsel, notified Mr. Norton of Borrower's default under the Loan Documents and made demand upon Mr. Norton for payment under the Guaranty.  A copy of the demand letter from ECP's counsel to Mr. Norton is annexed hereto as Exhibit 15.

33.     Mr. Norton defaulted under the Guaranty by failing and refusing to pay and perform thereunder.

34.     To date, Mr. Norton remains in default under the Guaranty.

35.     Beginning in September 2014 through the present, Borrower failed and refused to remit collections of tenant rents at the Property to ECP.  Instead of remitting collections of tenant rents to ECP, ECP alleges that Ms. Norton deposited the collections of rents into bank accounts owned or controlled by Borrower or her and beyond ECP's reach.

36.     The rents represent ECP's collateral for its loans to Borrower.

37.     Section 5 of the Assignment of Leases and Rents provides that upon the occurrence of an event of default under any of the Loan Documents, Borrower shall instruct its tenants to pay all rents to ECP.  Borrower is in default of the Loan Documents as described above.  ECP notified the tenants at the Property of their obligation to make their rental payments to ECP instead of to Borrower, however the tenants failed and refused to make payment to ECP.

38.     To date, Ms. Norton has failed and refused to remit collections of rents to ECP despite demand therefor.

## <u>COUNT ONE</u>

39.     ECP repeats and realleges paragraphs 1 through 35 herein.

40.     Mr. Norton is in default pursuant to the terms of the Guaranty.

41.     Pursuant to the Guaranty, there is due and owing to ECP from Mr. Norton as of November 26, 2014 the sum of $2,352,168.24, plus interest, costs and fees, including attorneys' fees.

42.     ECP demands judgment against Mr. Norton for his breach of contract in the amount of $2,352,168.24, or such amount as may be proved at trial, plus interest, costs and fees, including attorneys' fees.

## **COUNT TWO**

43.     ECP repeats and realleges paragraphs 1 through 39 herein.

44.     Ms. Norton failed and refused to remit collections of tenant rents at the Property to ECP, and instead deposited the collections of rents into bank accounts owned or controlled by Borrower or her and beyond ECP's reach.

45.     Ms. Norton has no right, title, claim, or interest in and to the rents, which serve as ECP's collateral for its loans to Borrower.

46.     Ms. Norton is not entitled to assert any statutory lien or other claim against the rents.

47.     Ms. Norton's refusal to turn over the rents to ECP after demand is an intentional and unlawful exercise of ownership, dominion, and control by Ms. Norton of ECP's collateral and constitutes Ms. Norton's denial and repudiation of ECP's rights to immediate and final possession of the funds.

48.      Ms. Norton knew that she did not own or have any claim to possession of the rents at the time she came into possession thereof.  Despite this, Ms. Norton refuses to pay or surrender the rents to ECP.  Ms. Norton is deliberately preventing ECP from mitigating its damages and protecting its interest in its collateral.

49.     Ms. Norton is using and consuming the funds without making payments to ECP.

50.     ECP demands judgment against Ms. Norton for her conversion in the amount of $140,681.02, or such amount as may be proved at trial, plus interest, costs and fees, including attorneys' fees.

**WHEREFORE:**

Plaintiff, ECP Property II LLC, demands:

1.      On the first claim against defendant Joseph Norton, judgment in the amount of $2,352,168.24, or such amount as may be proved at trial, plus interest, costs and fees, including attorneys' fees.

2.      On the second claim against defendant Thema Norton, judgment in the amount of $140,681.02, or such amount as may be proved at trial, plus interest, costs and fees, including attorneys' fees.

3.      On all claims hereunder, such other and further relief as maybe appropriate.


Dated: July 31, 2015                         **Leitess Friedberg PC**


                                              /s/ Gordon S. Young
                                             Jeremy S. Friedberg (JF-3772)
                                             Gordon S. Young (GY-8331)
                                             10451 Mill Run Circle, Suite 1000
                                             Baltimore, Maryland 21117
                                             jeremy.friedberg@lf-pc.com
                                             gordon.young@lf-pc.com
                                             (410) 581-7400
                                             (410) 581-7410 (facsimile)

                                             *Attorneys for ECP Property II LLC*

# EXHIBIT 1

## BUILDING LOAN AGREEMENT

Dated as of August 20, 2008

BETWEEN

## BANCO POPULAR NORTH AMERICA,

### ("Lender")

having an office at
120 Broadway, 16th Floor
New York, New York 10036

AND

## RIVERROCK NEHEMIAH REALTY LLC

### ("Borrower")

having an address at:
771 Thomas S. Boyland Street
Brooklyn, New York 11212

| | |
|---|---|
| "Lender's Counsel": | Edwards Angell Palmer & Dodge LLP<br>750 Lexington Avenue<br>New York, New York 10022<br>Attention:  Kevin C. George, Esq. |
| "Amount of Loan": | $1,912,341 |

NYC 308333.3

## PRELIMINARY STATEMENT

The Borrower is owner of the fee simple interest in the **"Premises,"** as such term is hereinafter defined, and as more particularly described in Schedule A attached hereto and made a part hereof. The Borrower has applied to the Lender for (i) the **"Loan"**, as such term is hereinafter defined, and Lender has agreed to make the Loan to Borrower (subject to the terms and conditions set forth herein) to partially finance the construction of the **"Improvements,"** as such term is hereinafter defined, on the Premises, and (ii) the **"Project Loan"**, as such term is defined herein, and Lender has agreed to make the Project Loan to Borrower (subject to the terms and conditions set forth in the **"Project Loan Agreement"**, as such term is defined herein) to partially finance non-cost-of Improvement items.

- 2 -

# ARTICLE 1

## Particular Terms and Definitions

       1.01         As used in this Building Loan Agreement (this **"Agreement"**), the following terms shall have the respective meanings indicated opposite each of them; where the meaning of any term is stated to be "None", provisions involving the application of that term shall be disregarded as they relate to said term only.

| | |
|---|---|
| **"ADA"** | - Americans with Disabilities Act of 1990 (Pub. L. 101-336). |
| **"Aggregate Change Order Amount"** | - $100,000. |
| **"Architect's Agreement"** | - The agreement dated July 8, 2005 between Borrower and the Borrower's Architect. |
| **"Assignment of Contracts"** | - The assignment of contracts and other agreements relating to the Premises and construction of the Improvements dated the date hereof from Borrower to Lender. |
| **"Assignment of Rents"** | - The assignment of leases and rents dated the date hereof from Borrower in favor of Lender. |
| **"Bonding Company"** | - The sureties, if any, providing the Payment and Performance Bonds, reasonably acceptable to Lender and having an A.M. Best's rating of "A" or better. |
| **"Borrower's Architect"** | - Danois Architects, P.C. |
| **"Borrower's Counsel"** | - Goldstein & Hall PLLC, 44 Wall Street, 12th Floor, New York, New York 10005. |
| **"Borrower's Equity"** | - An amount not less than $561,126, including $327,600 for allocated land value and $233,526 in cash. |
| **"Change Order Amount"** | - $10,000. |
| **"Commencement Date"** | - The date of commencement of the construction of the Improvements, as determined by the Construction Consultant. |

| | |
|---|---|
| **"Commitment Fee"** | - $19,227 (.85% of the maximum amount of the Loan) payable by Borrower to Lender at or prior to the Closing Date in connection with the Loan. |
| **"Completion Date"** | - The date which is the day prior to the eighteen (18) month anniversary of the Closing Date. |
| **"Completion of the Project"** | - Shall have the meaning set forth in <u>Section 4.03</u> of this Agreement. |
| **"Construction Consultant"** | - KOW Building Consultants or such other construction consultant as may be designated by Lender from time to time. |
| **"General Contractor"** | - Procida Construction Corp., or such other contractor as shall be approved by Lender in writing. |
| **"HDC"** | - Means New York City Housing Development Corporation, its successors and/or assigns. |
| **"Improvements"** | - The new construction on the Premises of a shell of a commercial condominium unit to contain approximately 10,669 square feet of retail space, which shall be located on the ground floor of the Condominium, where the other unit shall be the Related Project. |

1.02   The following terms, as used herein, shall have the following meanings:

| | |
|---|---|
| **"ADA"** | - Shall have the meaning ascribed thereto in <u>Section 5.02(x)</u> of this Agreement. |
| **"Building Loan Amount"** | - The amount of $1,912,341. |
| **"Building Loan Trust Account"** | - A separate non-interest bearing bank account to be established by Borrower with Lender into which Lender shall deposit advances of the Loan, which shall not be drawn upon by Borrower except to pay Direct Costs and Indirect Costs previously approved by Lender. |

| | | |
|---|---|---|
| **"Building Mortgage"** | - | The Building Loan Mortgage, Assignment of Leases and Rents, and Security Agreement dated the Closing Date from Borrower in favor of Lender in the amount of the Building Loan Amount securing the Building Note. |
| **"Building Note"** | - | The Building Loan Note dated the Closing Date executed by Borrower in favor of Lender in the maximum amount of the Loan and secured by the Building Mortgage. |
| **"Business Day"** | - | Shall have the meaning ascribed to such term in Section 7.10 of this Agreement. |
| **"Cash Collateral"** | - | Shall mean cash delivered to Lender by General Contractor on or before the Closing Date in an amount equal to ten percent (10%) of the amount of the General Contract. |
| **"Cash Collateral Agreement"** | - | Shall mean that certain equity cash collateral agreement between Lender and General Contractor dated the date of this Agreement pertaining to the Cash Collateral. |
| **"Change Orders"** | - | Any amendments or modifications to the Plans or General Contract, which amendment or modification shall be in writing. |
| **"City"** | - | The City of New York. |
| **"Closing Date"** | - | The date of this Agreement. |
| **"Completion Costs Guaranty"** | - | The completion costs guaranty regarding completion of the Improvements made by the Guarantors, jointly and severally, in favor of Lender dated the date hereof. |
| **"Condominium"** | - | Shall mean a two-unit mixed use condominium located within a to be built 6-story building to be located on the Real Property, and to be known as "River Rock Condominium." |

| | | |
|---|---|---|
| **"Condominium Act"** | - | Article 9(B) of the New York Real Property Law (§ 333d et. seq.) of the State of New York and all amendments, modifications or replacements thereof or regulations with respect thereto now or hereafter enacted. |
| **"Condominium Documents"** | - | All documents necessary for the creation and operation of the Condominium, including, but not limited to, no action letter from the New York State Attorney General's Office, the subdivision maps, the floor plans, Declaration, articles of incorporation, by-laws and rules and regulations of a condominium association or corporation, a management agreement and all other documents relating to the creation on the Premises, or a part thereof, of the Condominium and the regulation and administration thereof. |
| **"Conversion Date"** | - | If Lender is the Permanent Lender, then it shall mean the date on which all of the conditions of Article VIII hereof are satisfied in order to convert the Loan in the amount of the Permanent Loan Amount into the Lender's Permanent Loan. |
| **"Corporate Guarantor"** | - | General Contractor. |
| **"DEC"** | - | The New York State Department of Environmental Conservation. |
| **"Declaration"** | - | The declaration of condominium creating the Condominium by Nominee, and to be offered for recording on or after the Closing Date in the office of the City Register, Kings County. |
| **"Direct Costs"** | - | The aggregate costs of all labor, materials, equipment and fixtures necessary for completion of construction of the Improvements. |
| **"Direct Costs Loan"** **"Indirect Costs Loan"** | - | That portion of the Loan applicable and equal to the sum of the Loan Budget Amounts for Direct Costs and Indirect Costs, respectively, shown on the Project Cost Statement. |
| **"Direct Cost Statement"** | - | A statement in form approved by Lender of Direct Costs incurred and to be incurred, trade by trade, to be prepared by the General Contractor. |

**"Environmental Consultant"**   -   Lockwood, Kessler & Bartlett, Inc.

**"Environmental Indemnity"**   -   The environmental indemnity dated the date hereof executed by the Borrower and the Individual Guarantor in favor of Lender relating to Hazardous Materials.

**"Financial Statements"**   -   With respect to Borrower, means (i) semi-annual financial statements (including a detailed balance sheet and an income, expense and cash flow statement), prepared by a certified public accountant acceptable to Lender and certified by an officer of Borrower to be true, accurate and complete, to be delivered to Lender within ninety (90) days of each June 30 and December 31 of each year during the term of the Loan, (ii) copies of all federal and state tax returns filed by Borrower during the term of the Loan, certified by an officer of Borrower to be true, accurate and complete, to be delivered to Lender within thirty (30) days of the filing date of each such return occurring during the term of the Loan, (iii) audited semi-annual financial statements for the Improvements within ninety (90) days after each calendar quarter during the term of the Loan in form approved by Lender, and (iv) monthly leasing report and rent roll in such detail as Lender may require.

- With respect to General Contractor, means (i) unaudited annual financial statements (including a detailed balance sheet and an income, expense and cash flow statement), acceptable to Lender and certified by an officer of General Contractor to be true, accurate and complete, to be delivered to Lender within ninety (90) days of each December 31 of each year during the term of the Loan and (ii) copies of all federal and state tax returns and supporting schedules filed, certified by an officer of General Contractor to be true, accurate and complete, to be delivered to Lender within thirty (30) days of the filing date of each such return occurring during the term of the Loan to be delivered to Lender within thirty (30) days of the filing date of each such return occurring during the term of the Loan.

- With respect to any other person (including, without limitation, Individual Guarantor), means annual financial statements (including a detailed balance sheet , an income and expense statement, cash flow statement and contingent liability schedule), certified by such person if an individual, or otherwise by an officer of such person (or its general partner or managing member) to be true, accurate and complete, to be delivered to Lender within ninety (90) days of December 31 of each year during the term of the Loan and (ii) copies of all federal and state tax returns and supporting schedules filed by Individual Guarantor during the term of the Loan, certified by Individual Guarantor to be true, accurate and complete, to be delivered to Lender within thirty (30) days of the filing date of each such return occurring during the term of the Loan.

| | |
|---|---|
| **"Financing Statements"** | - Shall mean the Uniform Commercial Code Financing Statements (UCC-1) from Borrower, as debtor, in favor of Lender, as secured party. |
| **"General Contract"** | - A contract or agreement in Proper Form which satisfies the General Contract Terms. |
| **"General Contract Amount"** | - $1,857,174. |

| | | |
|---|---|---|
| **"General Contractor Security"** | - | Shall mean the original Payment and Performance Bonds, original Letter of Credit or the Cash Collateral. |
| **"General Contract Terms"** | - | The terms of the General Contract shall provide, <u>inter alia</u>, that it (i) be an AIA guaranteed maximum price contract, (ii) contain all riders, addenda and other instruments referred to therein as **"contract documents"**, (iii) be between Borrower and the General Contractor, (iv) be in an amount not to exceed the General Contract Amount, (v) be for the entire work, labor, materials and supplies with respect to the construction of the Improvements in accordance with the Plans, (vi) include the standard AIA specifications and (vii) contain Lender's "construction contract rider". |
| **"General Contractor's Counsel"** | - | Sarah Williams, Esq., c/o SDS Procida, 456 E. 173rd Street, Bronx, New York 10457. |
| **"Governmental Authorities"** | - | The United States of America, the State of New York, the City of New York and any political subdivision, agency, department, commission, board, bureau or instrumentality of any of them, including any local authorities, which exercises jurisdiction over the Premises, the Improvements, Borrower or any Guarantor. |
| **"Guarantors"** | - | Collectively, Individual Guarantor and the Corporate Guarantor. |
| **"Guarantors' Counsel"** | - | Goldstein & Hall PLLC, 44 Wall Street, 12th Floor, New York, New York 10005. |
| **"Guaranty"** | - | Collectively, (i) the Completion Cost Guaranty, and (ii) the Payment Guaranty. |
| **"Hazardous Materials"** | - | Asbestos, polychlorinated biphenyls and petroleum products, mold, and any other hazardous or toxic materials, wastes and substances which are defined as a "hazardous waste," "hazardous material," "hazardous substance," "extremely hazardous waste" or "restricted hazardous waste" under any provision of the laws of the City of New York, State of New York or the laws of the United States. |

| | | |
|---|---|---|
| **"Hazardous Waste Report"** | - | Collectively, that certain Phase I environmental site assessment dated May 20, 2008 and prepared by the Environmental Consultant. |
| **"Indirect Costs"** | - | Certain costs (other than Direct Costs) of completion of the Improvements, including but not limited to, architects', engineers' and Lender's Counsel's fees, filing fees, ground rents, interest on and recording taxes and title charges in respect of building loan mortgages, real estate taxes, water and sewer rents, survey costs, loan commitment fees, insurance and bond premiums and such other non-construction costs as are part of the "cost of improvement", as such quoted term is defined in the Lien Law. |
| **"Indirect Cost Statement"** | - | A statement in form approved by Lender of Indirect Costs incurred and to be incurred to be prepared by Borrower. |
| **"Individual Guarantor"** | - | Joseph Norton. |
| **"Initial Advance"** | - | The first advance of the Loan proceeds to be made hereunder. |
| **"Involuntary Rate"** | - | Shall have the meaning ascribed thereto in the Note. |
| **"Lender's Counsel"** | - | Edwards Angell Palmer & Dodge LLP, 750 Lexington Avenue, New York, New York 10022. |
| **"Lender's Permanent Loan"** | - | Pursuant to <u>Sections 8.05 and 8.06 of Article VIII</u> hereof, conversion of the Loan equal to the Permanent Loan Amount on the Conversion Date to a permanent loan on the Lender's Permanent Loan Terms. |
| **"Lender's Permanent Loan Fee"** | - | An amount equal to .85% of the Permanent Loan Amount if Lender makes the Lender's Permanent Loan to Borrower. |
| **"Lender's Permanent Loan Terms"** | - | The Lender's material terms and conditions regarding the Lender's Permanent Loan, as set forth on <u>Exhibit G</u> attached hereto. |

| | | |
|---|---|---|
| **"Letter of Credit"** | - | That certain letter of credit satisfactory to Lender in its sole discretion issued on behalf of General Contractor in favor of Lender in an amount and from an issuer satisfactory to Lender and otherwise in Proper Form. |
| **"Lien Law"; "Lien Law Statement"** | - | The Lien Law of the State of New York, as amended; the verified statement of Borrower, annexed hereto as <u>Exhibit A</u>, required by the Lien Law. |
| **"Lien Waiver"** | - | The lien waiver in the form of <u>Exhibit F</u> attached hereto and made a part hereof |
| **"Loan"** | - | The Direct Costs Loan and Indirect Costs Loan, collectively, in the aggregate amount not to exceed the Building Loan Amount. |
| **"Loan Budget Amounts"** | - | The portion of the Loan as set forth on the Project Cost Statement, to be advanced for each category of Direct Costs and Indirect Costs. |
| **"Loan Documents"** | - | The Note, Mortgage, Guaranty, Environmental Indemnity, this Agreement, the Financing Statements, the Notice of Lending, the Project Loan Agreement, the Assignment of Contracts, Assignment of Rents, the Cash Collateral Agreement, if General Contractor provides Cash Collateral and any other document given as security for the Loan and/or Project Loan. |
| **"LTC"** | - | The ratio of the aggregate amount of the Loan and Project Loan to the amount of the Total Development Costs, which shall not at any time exceed 80%, as determined by Lender in its sole discretion. |
| **"LTV"** | - | The ratio of the amount of the Loan and Project Loan to the value of the Premises, as improved by the Improvements, which shall not exceed 75%. |
| **"Major Subcontractor"; "Major Subcontract"** | - | Any subcontractor or supplier engaged by the General Contractor and/or the Borrower under one or more contracts or work orders aggregating $100,000 with respect to the Improvements; any such contract or work order. |

| "Maturity Date" | - | Shall mean the maturity date set forth in the Note. |
| "Mortgage" | - | Collectively, the Building Mortgage and the Project Mortgage. |
| "Mortgaged Property" | - | The Premises, Improvements and other property constituting the "Mortgaged Property," as said quoted term is defined in the Mortgage. |
| "Nominee" | - | River Rock Housing Development Fund Company, Inc. |
| "Note" | - | Collectively, the Building Note and the Project Note. |
| "Notice of Lending" | - | The notice of lending relating to the Premises and construction of the Improvements dated the date hereof between Borrower and Lender pursuant to Section 73 of the Lien Law of the State of New York. |
| "Operating Account" | - | A separate account to be established by Borrower with Lender to be used to pay any expenses incurred by Borrower in connection with the Improvements not paid out of the Loan or Project Loan proceeds. |
| "Patriot Act" | - | The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws. |
| "Patriot Act Offense" | - | Shall have the meaning set forth in Section 5.01(s) hereof. |
| "Payment and Performance Bonds" | - | The payment and performance bonds, if any, issued by a Bonding Company on behalf of General Contractor with respect to the General Contract with a dual obligee rider naming Lender as a dual obligee and otherwise in Proper Form securing the performance of the General Contractor in an amount not less than the amount of the General Contract. |

"Permanent Lender"  - Lender, or another permanent lender selected by Borrower.

"Permanent Loan"  - A permanent loan from a Permanent Lender to the Borrower in the Permanent Loan Amount, or such greater amount as shall be elected by Borrower if Lender is not the Permanent Lender.

"Permanent Loan Amount"  - $2,262,010, subject to the provisions of Sections 8.05, 8.06 and 8.08 of this Agreement.

"Person"  - Shall mean any individual, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, joint venture, sole proprietorship, or any other business entity or Governmental Authorities.

"Plans"  - All final drawings, plans and specifications prepared by Borrower, Borrower's Architect, or the General Contractor, and approved in writing by Lender and the Construction Consultant, which describe and show the labor, materials, equipment, fixtures and furnishings necessary for the construction of the Improvements, including all amendments and modifications thereof made by approved Change Orders (and also showing minimum grade of finishes and furnishings for all areas of the Improvements to be leased or sold in ready-for-occupancy conditions) as to the Improvements.

"Premises"  - The real property described on Schedule A attached hereto upon which the Improvements are to be constructed, which premises constitute the commercial unit of the Condominium.

"Project Costs"  - Items listed on the Project Cost Statement to be advanced from the Project Loan.

| | | |
|---|---|---|
| **"Project Cost Statement"** | - | A statement prepared by Borrower in form approved in writing by Lender and the Construction Consultant setting forth, by category, the Total Development Costs and the Loan Budget Amounts in respect of the Direct Costs Loan and Indirect Costs Loan which includes (i) a capitalized principal and interest reserve of not less than $94,166 with respect to the Lender's Permanent Loan, and (ii) a hard cost contingency equal to approximately five percent (5%) of Direct Costs, and (iii) a soft cost contingency not less than $16,400. |
| **"Project Loan"** | - | The loan from Lender to Borrower in the aggregate amount of the Project Loan Amount, which is evidenced by the Project Note and secured by the Project Mortgage. |
| **"Project Loan Amount"** | - | The amount of $349,669. |
| **"Proper Form"** | - | In form and substance satisfactory to Lender and Lender's Counsel. |
| **"Real Estate Tax Abatement"** | - | An exemption from real estate tax taxes for the Improvements which reduces the real estate tax liability for the Premises for a period of thirty (30) years after the issuance of the certificate of occupancy for the Premises. |
| **"Real Property"** | - | Shall mean the real property described in <u>Schedule B</u> attached hereto. |
| **"Related Project"** | - | The construction of a residential condominium unit in the Condominium to contain 54 units (inclusive of a superintendent's unit), 19 below grade parking spaces and approximately 2,081 square feet of community space. |
| **"Requisition"** | - | A statement by the Borrower in form and substance similar to <u>Exhibit E</u> attached hereto and made a part hereof satisfactory to Lender setting forth the amount of the Loan advance requested in each instance with respect to the Improvements and including, if requested by Lender |

|  | (i) | the Direct and Indirect Cost Statements; |
|---|---|---|
|  | (ii) | a cost certification executed by the General Contractor in form approved in writing by Lender and the Construction Consultant; |
|  | (iii) | payment receipts from General Contractor in a form approved in writing by Lender and Construction Consultant; |
|  | (iv) | proof of payment of all Direct and Indirect Costs covered by all previous Requisitions; and |
|  | (v) | Lien Waiver from the General Contractor and all Subcontractors for all sums advanced up to and including the previous Requisition. |

**"Retainage Percentage"** — Ten percent (10%) of the actual Direct Costs incurred by Borrower, for the work in place as determined by the Construction Consultant, at Lender's option reducing to five percent (5%) at fifty percent (50%) completion of the Improvements, as determined by Construction Consultant.

**"Single Purpose Entity"** — An entity that complies with the requirements of Section 7.23 of this Agreement.

**"Subcontractors"** — Any Person who has performed work and/or supplied any labor and/or materials with respect to the Improvements other than the General Contractor.

**"Title Insurer"** — First Nationwide of N.Y., Inc, as agent for Old Republic National Title Insurance Company, or another insurer licensed to transact business in the State of New York, reasonably approved by Lender, which is issuing the title insurance policy or policies insuring the Mortgage.

**"Total Development Costs"** — $2,823,136.

**"Unavoidable Delay"**     - Any delays due to strikes, acts of God, governmental restrictions, unavailability of labor and/or materials, terrorism enemy action, civil commotion, fire, unavoidable casualty, or other causes beyond the control of the Borrower; provided, however, that any lack of funds shall not be deemed a cause beyond the control of the Borrower.

## ARTICLE 2

### Loan Advances

2.01        Subject to the provisions of this Agreement, Lender will advance and Borrower will accept the Loan installments as set forth below.  Lender shall have no obligation to close the Loan or make the Initial Advance hereunder unless and until all of the applicable conditions set forth in Articles III and VIII hereof have been satisfied.

The Initial Advance will be made upon the satisfaction of the applicable conditions set forth in Article III hereof, and all subsequent advances shall be made monthly thereafter, upon the satisfaction of the applicable conditions set forth in Article IV and Article VIII hereof, in amounts which shall be equal to the aggregate of the Direct Costs and Indirect Costs incurred by Borrower through the end of the period covered by the Requisition, less:

(a)        the greater of the Retainage Percentage of such Direct Costs or the actual amounts required to be retained as set forth in the General Contract; and

(b)        the total of the Loan advances theretofore made on account thereof; and

(c)        all or a portion of the amount by which any actual Direct Costs or Indirect Costs are or are estimated by Lender or Construction Consultant to be greater than the respective Loan Budget Amounts for such costs;

and, at the election of Lender, less any combination of the following further amounts:

(d)        any costs covered by the Requisition not approved, certified or verified as provided in Section 2.02 hereof, any Indirect Costs covered by a previous Requisition for which any requested proof of payment or payment receipts have not been received by Lender, and/or any Direct Costs covered by a previous Requisition for which any requested proof of payment or payment receipts and Lien Waivers have not been received by Lender and the Construction Consultant.

2.02        All Direct Costs shall be certified by the General Contractor and must be in accordance with the Direct Cost Statement based upon a site observation of the Improvements made by the Construction Consultant not more than thirty (30) days prior to the date of such draw, in which the Construction Consultant shall in substance (i) verify that the portions of the Improvements completed as of the date of such site observation have been completed substantially in accordance with the Plans, and (ii) state its estimate of (1) the percentage of the Improvements completed as of the date of such site observation on the basis of work in place as part of the Improvements and the Project Cost Statement, (2) the Direct Costs actually incurred for work in place as part of the Improvements as of the date of such site observation, (3) the sum necessary to complete the Improvements in accordance with the Plans and (4) the amount of time from the date of such inspection that will be required to achieve Completion of the Project. Verification of the monthly progress and Direct Costs which have been incurred by Borrower from time to time, and the estimated total Direct Costs, shall be conclusively determined by the Construction Consultant, except that both Direct Costs and Indirect Costs are also subject to approval and verification by Lender from time to time.

2.03       All advances to Borrower are to be made at Lender's office stated on the cover page hereof or at such other place as Lender may designate and shall be deposited in the Building Loan Trust Account.   Requisitions together with all attachments thereto shall be received by Lender at least ten (10) Business Days prior to the date of the requested advance and Borrower shall schedule a site inspection with Construction Consultant with respect to each such advance on or before the date of the submission to the Lender of such Requisition.

2.04       Amounts of the Direct Costs Loan not advanced pursuant to this Section 2.04 or Section 2.01 hereof during the course of construction of the Improvements (excluding retainage) may be advanced by Lender in its sole discretion upon the satisfaction of the conditions set forth in Section 4.02 hereof.   Loan Budget Amounts for Indirect Costs not advanced prior to Completion of the Project shall be advanced until exhausted, not more frequently than once a month, for Indirect Costs as incurred after such completion.

2.05       (a)   Lender may, in its absolute discretion accelerate all or any portion of the amounts to be advanced hereunder without regard to Borrower's satisfaction of the conditions to its entitlement to Loan proceeds and no person dealing with Borrower or the General Contractor and any Subcontractor or any other person shall have standing to demand any different performance from Lender.

(b)   CONTRACTORS,   SUBCONTRACTORS,   LABORERS,   and SUPPLIERS are cautioned that if Loan advances are made under the alternative set forth in paragraph (a) above, proceeds of the Loan remaining to be advanced at the time of the Completion of the Project), or any time prior thereto, may be inadequate to pay all lienable claims incurred by Borrower and unpaid at that time.   All potential lienors are therefore cautioned to exercise sound business judgment in the extension of credit to Borrower and should not expect Lender to make Loan advances in such amounts and to exercise such judgment for themselves.   Moreover, they are reminded that subdivision (3) of Section 13 of the Lien Law provides that "Nothing in this subdivision shall be considered as imposing upon the lender any obligation to see to the proper application of such advances by the owner," and Lender has no intention of voluntarily imposing such obligation on itself.

2.06       If the Lender makes advances of any Loan proceeds before they are due because the Lender believes it advisable to so do, such advances shall be made pursuant to and not in modification hereof, but the making of any such advance or part thereof shall not be deemed an approval or acceptance by the Lender of the work done prior thereto.

2.07       Advances of the Loan shall be evidenced by the Building Note and secured by the Building Mortgage.   Advances of the Project Loan shall be evidenced by the Project Note and secured by the Project Mortgage.

2.08       In the event that the Borrower does not submit any monthly Requisition for funds under this Agreement within five (5) Business Days after receipt by Borrower of notification from the Construction Consultant of its approval of a bill/invoice/requisition from the General Contractor under the General Contract or a Subcontractor under a subcontract, Lender may, in the exercise of its discretion without the need for any further authorization of

Borrower, make advances of the Direct Costs Loan directly to the General Contractor or any Subcontractor for work performed or materials furnished.

2.09        If, at any time, the Borrower shall request that the undisbursed balance of the Loan Budget Amount for any category of cost shown on the Project Cost Statement be reallocated to another category of cost, Lender shall consent to such reallocation (i) if, in Lender's sole judgment, the undisbursed balance of the Loan Budget Amount for such category of cost is excessive, and the undisbursed balance of the category of cost to which the funds shall be reallocated is insufficient; (ii) provided that any reallocation of Loan Budget Amounts pursuant to this Section 2.09 will not have the effect of reducing the net sum which Borrower estimates will be available to it from the Loan to pay the General Contractor and each Subcontractor for the cost of Improvements as set forth on the Lien Law Statement, (iii) provided the "Interest" or contingency category is not reduced, provided, however, that the Borrower shall in no event or under any circumstance have the right to reallocate any portion of the "Interest" category or the contingency without in each instance obtaining the prior approval of the Lender, which approval may be withheld in the sole and absolute discretion of the Lender, or to cause a reallocation to  occur that in the opinion of the Lender and Lender's Counsel or the Title Insurer will adversely affect or impair in any manner whatsoever the lien or priority of lien of the Mortgage.

2.10        Notwithstanding anything in this Agreement to the contrary, no advances of the Loan for Direct Costs with respect to any particular category of expenses shall be made until such time as the Lender has received from the Borrower copies of Lien Waivers in Proper Form of the General Contract with respect to such category.

2.11        Lender shall not be required to make any advances for building materials or furnishings which are not affixed to or incorporated in the Improvements.

2.12        Notwithstanding anything to the contrary contained in Section 2.01, Lender shall not be obligated to advance with respect to each and every category of Direct Costs, Indirect Costs and Project Costs an amount greater than the amount allocated for each such category of costs as specified as the Project Cost Statement for such category of costs.

2.13        The proceeds of the Loan shall be used by Borrower solely for the payment of Direct Costs and Indirect Costs.

## ARTICLE 3

### Conditions Precedent to Lender's
### Obligation to Make the Initial Advance

3.01        Lender shall not be obligated to make the Initial Advance until the following conditions shall have been satisfied by Borrower prior to the Closing Date or waived in writing by Lender:

(a)        Lender shall have received and approved the items specified in Section 3.02 below;

(b)        The Construction Consultant shall have received and approved the items specified in Section 3.03 below;

(c)        Lender's Counsel shall have received and approved the items specified in Section 3.04 below;

(d)        The representations and warranties made in Article V hereof shall be true and correct on and as of the date of the Initial Advance with the same effect as if made on such date;

(e)        The Improvements, if any, shall not have been materially injured or damaged by fire or other casualty unless Lender shall have received insurance proceeds sufficient in the judgment of the Construction Consultant to effect the satisfactory restoration of the damage to said Improvements and to permit completion of the Improvements prior to the Completion Date;

(f)        There shall exist no default under the Loan Documents, irrespective of whether or not the same shall constitute an Event of Default thereunder or hereunder;

(g)        Lender shall have received evidence of payment of all premiums in respect of the title insurance policy insuring the Mortgage and all mortgage recording taxes, if any, and other title fees have been paid in respect to the Mortgage;

(h)        Lender shall have approved the Plans, the state of title to the Premises reflected in the title policy insuring the Mortgage, the survey and such other documents as Lender and Lender's Counsel may specify;

(i)        Such documents, letters, affidavits, reports and assurances, as Lender, Lender's Counsel, Construction Consultant, and/or the Title Insurer may require;

(j)        Lender shall have received original fully executed Loan Documents; and

(k)        Lender and Lender's Counsel shall have received evidence in Proper Form that the Premises and Improvements qualify and are available for the RE Tax Abatement.

3.02        The items to be received in Proper Form by Lender prior to the Closing Date and the Initial Advance shall be:

(a)        The Commitment Fee, which is nonrefundable and which shall be retained by Lender whether or not any advances are made under this Agreement;

(b)        Current Financial Statements for the previous two (2) fiscal years and such other financial data as Lender shall require together with evidence that there has occurred no material adverse change in the financial condition reflected therein between the respective dates thereof and the date hereof;

(c)        An appraisal of the Premises and Improvements satisfactory to Lender in its sole discretion showing the appraised value to be in compliance with the LTV;

(d)        A plan and cost review to be prepared by the Construction Consultant to the effect that (i) the Plans are satisfactory and have been approved by it and all necessary Governmental Authorities, (ii) the Improvements as shown by the Plans will comply with applicable zoning laws, ordinances and regulations, (iii) the General Contract is in effect and satisfactorily provides for the construction of the Improvements, (iv) all roads and utilities necessary for the full utilization of the Improvements for their intended purposes have been completed or the presently installed and proposed roads and utilities will be available and sufficient for the full utilization of the Improvements for their intended purpose, (v) the construction of the Improvements theretofore performed, if any, was performed in accordance with the Plans and will be finished in accordance with the Plans along with all necessary roads and utilities on or before the Completion Date, (vi) the Premises are not located in either a "Fresh Water Wetlands Area" or a "Tidal Wetlands Area", as those terms are defined by the DEC, and (vii) the Direct Cost Statement shows that there will be sufficient funds for the completion of the Improvements on or before the Completion Date;

(e)        (i) The fully executed copy of the General Contract certified by Borrower to Lender to be true and complete in Proper Form, together with a copy of the Architect's Agreement also so certified and (ii) a certified list of all Subcontractors then known or intended to be contracted with to perform work and/or supply materials for the Improvements, each of which shall be satisfactory to Lender and Construction Consultant;

(f)        The policies of property, builders risk and hazard and comprehensive general liability insurance required by this Agreement and the Mortgage, including flood insurance, if applicable and automotive liability, personal injury and fire insurance (together with evidence of the payment of the premiums therefor) which policies shall be in the amounts, under the terms and from the insurers admitted in the state in which the Premises is located and rated by A.M. Best "A/IX" or better and acceptable to Lender in its sole and absolute discretion and will contain an endorsement specifically providing that, in the case of any damage, all insurance proceeds will be paid to Lender as set forth in the Mortgage and if no flood insurance is applicable, evidence that the Premises are not located in an area that has been identified by the United States Secretary of Housing and Urban Development as an area requiring special flood insurance together with evidence satisfactory to Lender that all insurance premiums payable in

connection with the required insurance policies have been prepaid for at least one (1) year from the Closing Date;

       (g)     The Project Cost Statement;

       (h)     Requisition for the Initial Advance, together with proof of payment of any Indirect Costs included therein;

       (i)     Evidence that the Premises is not currently, has never been and shall not be subject to Hazardous Materials (stored or used); such evidence shall include, without limitation, at Borrower's expense, a detailed report, certification and a reliance letter by a properly qualified engineer, which shall include, *inter alia*, a certification that such engineer has obtained and examined the list of prior owners, tenants and other users, and has made an on-site physical examination of the Premises, and a visual observation of the surrounding area, and has searched all federal and New York State databases which list properties with Hazardous Materials, and has found no evidence of past or present Hazardous Materials activities or the presence of Hazardous Materials and which shall be in compliance with the ASTM standards which became effective November 1, 2006;

       (j)     Copies of the items required by paragraphs (c), (d), (h), (i) and (j) of Section 3.04 hereof;

       (k)     Any approvals, building permits or authorizations issued by any Governmental Authorities required for the construction of the Improvements;

       (l)     A progress schedule, construction schedule, or chart showing the interval of time over which each item of Direct Cost is projected to be incurred or paid;

       (m)     The General Contractor Security;

       (n)     Evidence satisfactory to the Lender that the Borrower has established and caused to be established various accounts with Lender, into which all funds shall be deposited relating to the Premises and the operation thereof, including but not limited to the Building Loan Trust Account, Operating Accounts, reserve accounts, rent security and project operating, which accounts shall remain in full and continuous use by the Borrower and its affiliate(s) from date hereof until the Loan and Project Loan are repaid in full;

       (o)     A copy of the Hazardous Waste Report;

       (p)     Evidence in Proper Form that Borrower's Equity has been invested into the Premises or is on deposit with Lender in a blocked account controlled by Lender;

       (q)     Evidence satisfactory to Lender that the there is no pending or threatened litigation or administrative action affecting the Premises and/or Improvements;

       (r)     On or before the Closing Date, evidence of the conveyance of the fee simple interest in the Premises to the Borrower and satisfactory proof of payment of all transfer

taxes on the conveyance, if any, and all outstanding real estate taxes, water and sewer charges and all liens, including any penalties and interest thereon;

(s)     Evidence of Borrower's Architect's liability and errors and omissions insurance;

(t)     A letter from the General Contractor in the form attached hereto as Exhibit C, together with a copy of the Architect's Agreement with Borrower's Architect and a letter from Borrower's Architect in the form of Exhibit B attached hereto, and none of the aforementioned documents have been amended, supplemented or otherwise modified or terminated and all are in full force and effect; and

(u)     Evidence satisfactory to Lender that (i) Individual Guarantor, directly or indirectly, owns 100% of the equity interests in and controls the Borrower, (ii) the Borrower is in existence and in good standing under the laws of the State of New York, (iii) Borrower is a Single Purpose Entity, and (iv) Borrower has full power to execute, deliver and perform the Loan Documents and to engage in and consummate the transactions described in this Agreement.;

3.03     The items to be received and approved by the Construction Consultant prior to the Initial Advance shall be:

(a)     Copies of a soil-engineer's report, a site plan (showing all necessary approvals, utility connections and site improvements) and the Plans, progress schedule and utility availability letters;

(b)     Copies of the items required by paragraphs (c), (e), (f), (g), (h), (k) and (l) of Section 3.02 hereof and by paragraphs (c), (d), (f), (g) and (h) of Section 3.04 hereof;

(c)     A letter from the DEC or the Borrower's Architect stating that the Premises is not located in either a "Fresh Water Wetlands Area" or a "Tidal Wetlands Area";

(d)     Copies of all inspection and test records and reports made by or for Borrower's Architect;

(e)     Copies of all documents listed as exceptions to title in the title policy required by paragraph (b) of Section 3.04 hereof;

(f)     If the Initial Advance consists in whole or in part of advances for Direct Costs, a copy of the Requisition therefor; and

(g)     Copies of all Plans.

3.04     The items to be received and approved, on Lender's behalf, by Lender's Counsel prior to the Closing Date and the Initial Advance shall be:

(a)     The executed copies of all Loan Documents;

(b)     A paid (i) copy of the owner's title insurance policy, and (ii) mortgagee title insurance policy, in the amount of the Mortgage in ALTA (2006) or other form approved by Lender, issued by the Title Insurer which shall insure the Mortgage to be a valid lien on Borrower's interest in the Mortgaged Property free and clear of all defects and encumbrances except those previously received and approved by Lender's Counsel, and shall contain:

          (i)     full coverage against mechanics' liens (filed and inchoate),

          (ii)     a reference to a current ALTA survey but no survey exceptions except those theretofore approved by Lender's Counsel,

          (iii)     a Pending Disbursements Clause in the form of Exhibit D hereto; and, if any such policy is dated earlier than the date of the Initial Advance, a continuation of or endorsement to such policy, in a form approved by Lender's Counsel, conforming to the requirements of said Exhibit D and setting forth no additional exceptions except those approved by Lender's Counsel, and

Premises,          (iv)     a metes and bounds description of each lot comprising the

          (v)     insuring that the Mortgage creates a first lien insofar as it relates to the Loan and a second lien as it relates to the Project Loan and that such interest is free and clear of all defects and encumbrances, and includes the following endorsements: waiver of arbitration, variable rate, land same as survey, environmental, standard New York, tax parcel, contiguity, if applicable, mortgage tax and access and such other endorsements and affirmative coverage as the Lender may require to the extent available in New York;

(c)     Copies of any and all authorizations including plot plan and subdivision approvals, zoning variances, sewer, building and other permits required by Governmental Authorities for the construction, use, occupancy and operation of the Premises and/or Improvements for the purposes contemplated by the Plans in accordance with all applicable building, environmental, ecological, landmark, subdivision, zoning codes, laws and regulations and all other requirements of Governmental Authorities;

(d)     Letters from Borrower's Architect and the General Contractor, in the forms attached hereto as Exhibits B and C, respectively, containing, among other things, their agreement to continue performance on Lender's behalf following Borrower's default;

(e)     UCC, litigation, bankruptcy and judgment searches against Borrower, Guarantors, General Contractor or other owner of the Premises (if other than Borrower) and advice from the Title Insurer to the effect that searches of proper public records disclose that, other than Lender's filings, no leases of personalty or financing statements is filed or recorded against the Premises, Borrower or other owner of any Mortgaged Property (if other than Borrower);

(f)     An ALTA survey (current to within 60 days of the Initial Advance) of the Premises certified to Lender, Borrower, its successors and/or assigns, and the Title Insurer, showing the actual location of:

(i)     the perimeter of the Premises by courses and distances,

(ii)     all easements, rights-of-way, and utility lines referred to in the title policy required by this Agreement or which actually service or cross the Premises,

(iii)     the lines of the public and private streets, roads and rights of way abutting the Premises and width thereof, and any established building lines,

(iv)     encroachments by improvements on adjacent property and the extent thereof upon the Premises, or by improvements on the Premises onto adjacent property and the extent thereof;

(v)     the Improvements to the extent constructed, and the relationship of the Improvements by distances to the perimeter of the Premises, established building lines and street lines and any set-backs established by restrictive covenants recorded against the Premises; and

(vi)     if the Premises are described as being on a filed map, a legend relating the survey to said map;

(g)     Letters from the local utility companies or Governmental Authorities or Borrower's Architect stating that gas, electric power, public sanitary and storm sewer and public water facilities and other utilities will be available to the Premises upon completion of construction of the Improvements;

(h)     Letter from the Borrower's Architect stating that the anticipated use of the Premises complies with all applicable zoning regulations and that the Improvements can be constructed "as-of-right" and will comply with all zoning laws, rules and ordinances and covenants and restrictions affecting the Premises;

(i)     An opinion of Borrower's Counsel, General Contractor's Counsel and Guarantor's Counsel in Proper Form;

(j)     Copies of the following documents in Proper Form with respect to the Borrower and Guarantors,

A.     If Borrower, or any of the Guarantors or any member, manager, general partner or joint venturer of either is a corporation, copies of the following documents with respect to each (unless otherwise indicated):

(i)     certificate of incorporation and all amendments and attachments thereto;

(ii)     filing receipts;

(iii)     by-laws;

(iv)     a good-standing certificate from the State of New York;

(v)     resolutions, certified by the corporate secretary, of the shareholders or directors of the corporation, or a unanimous written consent of such parties, authorizing the consummation of the transactions contemplated hereby and the execution, delivery and performance of the Loan Documents to be executed, delivered or performed by said corporation;

(vi)    a certificate of the corporate secretary as to the incumbency of the officers executing the Loan Documents to which such corporation is a party, or any of the other documents required hereby; and

(vii)   the by-laws and a certified copy of the certificate of incorporation from the state of its incorporation.

B.     if the Borrower, or any of the Guarantors or any member, manager, general partner or joint venturer is a partnership or venture:

(i)     any certificates filed or required to be filed by the partnership in the state of its formation and the State of New York in order for it to do business in those states;

(ii)    filing receipts;

(iii)   partnership agreement and all amendments and attachments thereto, certified by a general partner of such partnership to be true and complete;

(iv)    a good standing certificate from the State of New York; and

(v)     any consents by other partners required for the partnership to undertake the obligations undertaken by it in the Loan Documents and an acknowledgment by each general partner of his, her or its continued membership in the partnership.

C.     If the Borrower, or any of the Guarantors or any member, manager, general partner or joint venturer is a limited liability company:

(i)     operating agreement and all amendments and attachments thereto with respect to such limited liability company;

(ii)    articles of organization and all amendments and attachments thereto with respect to such limited liability company;

(iii)   filing receipts;

(iv)    a good standing certificate from the State of New York; and

(v)     any consents certified by the members of the limited liability company authorizing the limited liability company to undertake the obligations undertaken by it in the Loan Documents and an acknowledgment by each member of his, her or its continued membership in the limited liability company.

(k)     Copies of the items required by paragraphs (e), (f), (g), (k), (m), and (u) of Section 3.02 hereof;

(l)     Evidence that Borrower is the owner in fee simple of marketable title to Premises;

(m)     An affidavit in Proper Form of the authorized agent of Borrower and Guarantors, stating that to the best of his/her knowledge there is no litigation, pending or threatened, or investigation against Borrower and/or Guarantors which might materially interfere with or materially adversely affect its obligations under the Loan Documents to which it is a party;

(n)     An affidavit of the authorized agent of Borrower certifying that to the best of his/her knowledge neither it nor any of its members, officers, directors, principals or partners (i) is, or has been within the last five years, the subject of any civil or criminal investigation by any Governmental Authorities or any administrative proceeding in connection with their respective business practices, or (ii) has been found by any court of competent jurisdiction in a civil or criminal action to have violated any laws in connection with their respective business practices; and

(o)     Copies of all documents in connection with the conveyance of the Premises to Borrower.

## ARTICLE 4

### Conditions Precedent to Lender's
### Obligations to Make Advances After the Initial Advance

4.01 Lender's obligation to make Loan advances after the Initial Advance shall be subject to the satisfaction of the following conditions:

(a) All conditions of Article III and Article VIII hereof shall have been and remain satisfied as of the date of such advance;

(b) Lender and the Construction Consultant shall have received a Requisition for the advance, together with such other documentation and information as either of them may require;

(c) Lender shall have received a continuation report of or endorsement to the title policy insuring the Mortgage to the date of such advance, in the form approved by Lender's Counsel, conforming to the pending disbursement requirements set forth in Exhibit D hereto and setting forth no additional exceptions (including survey exceptions) except those approved by Lender's Counsel;

(d) If required by Lender, it shall have received a current ALTA survey of the Premises certified to it (and its successors and/or assigns) and the Title Insurer updated, with respect to all relevant requirements and information, to within ten (10) days of the advance;

(e) The representations and warranties made in Article 5 hereof shall be true and correct on and as of the date of the advance with the same effect as if made on such date;

(f) There shall exist no default hereunder, under the Mortgage, or under any other Loan Document, irrespective of whether or not the same shall constitute an Event of Default hereunder and/or thereunder.

4.02 In the case of the last Direct Costs Loan advance as provided in Section 2.04 hereof, Lender shall also have received:

(a) Advice from the Construction Consultant to the effect that construction of the Improvements has been completed in accordance with Section 4.03, and any necessary utilities and roads have been finished and made available for use, in accordance with the Plans and that he has received satisfactory evidence of the approval by all Governmental Authorities of the Improvements in their entirety for occupancy, and of the contemplated uses thereof, to the extent any such approval is a condition of the lawful use and occupancy thereof;

(b) A current final survey of the Premises, certified to the Title Insurer, Permanent Lender and the Lender, showing the completed Improvements;

(c) Final payment receipts and Lien Waivers from the General Contractor and all Subcontractors evidencing that all of them to whom proceeds of the immediately preceding

advance of the Loan were to be paid have been paid in full for all work performed to the date shown on the Borrower's request for such preceding advance, except for retainage; and

(d)     Evidence that the Borrower has filed the notice of completion of the Improvements necessary to establish commencement of the shortest statutory period for the filing of mechanics' and materialmen's liens arising out of construction of the Improvements.

4.03     Completion.  **"Completion of the Project"** shall be deemed to have occurred for purposes of this Agreement when all of the following conditions shall have been satisfied:

(a)     the Improvements shall have, in the opinion of the Lender and the Construction Consultant, been substantially completed in accordance with the Plans, and the Borrower's Architects and Construction Consultant shall have so certified to the Lender;

(b)     the Improvements shall contain all tangible personal property, if any, required for the use and operation of the Improvements (subject to clause (d) of this Section 4.03), or that may be required by any Governmental Authorities;

(c)     all temporary or permanent certificates of occupancy and all other permits required for the use and operation of the Improvements shall have been issued by or obtained from the appropriate Governmental Authorities and shall have been completed and accepted by the applicable Governmental Authority;

(d)     all costs and expenses incurred in connection with the Improvements have been paid in full; and

(e)     an as-built survey of the Premises shall have been provided to and shall be reasonably acceptable to the Lender, the Title Insurer and Permanent Lender.

## ARTICLE 5

### Borrower's Representations, Warranties and Covenants

5.01        Borrower represents and warrants to Lender that:

(a)        If it, or any of the Guarantors or any managing member of either, is a corporation, each such entity is duly organized, validly existing and in good standing under the laws of the state of its incorporation, has stock outstanding (if a stock corporation) which has been duly and validly issued, is qualified to do business and is in good standing in the State of New York with full power and authority to consummate the transactions contemplated hereby; if it, or any of the Guarantors or any managing member of either, is a partnership or venture, each such entity is duly formed and validly existing, is fully qualified under the laws of the State of New York to do business therein, and has full power and authority to consummate the transactions contemplated hereby; if it, any of the Guarantors or any managing member of either, is a limited liability company, each such entity is duly formed and validly existing, is fully qualified under the laws of the State of New York to do business therein, and has full power and authority to consummate the transactions contemplated hereby;

(b)        The Plans are satisfactory to it, and have been reviewed and approved by it, the Guarantors, Lender, Construction Consultant and Borrower's Architect and, to the extent required by applicable law or any effective restrictive covenant, by all Governmental Authorities and the beneficiary of any such covenant; all construction, if any, already performed on the Improvements has been performed on the Premises in accordance with the Plans approved by the Persons named above and with any restrictive covenants applicable thereto and there are no structural defects in such existing portions of the Improvements or violations of any requirement of any Governmental Authorities with respect thereto; the planned use of the Improvements complies with applicable zoning ordinances, regulations and restrictive covenants affecting the Premises as well as all environmental, ecological, landmark, and other applicable laws and regulations; and all requirements for such use have been satisfied and all necessary building permits and approvals (including, but not limited to, all environmental approvals) for the Improvements, if any are required, have been obtained from the appropriate Governmental Authorities; the Improvements can be constructed for the Total Development Costs by the Completion Date;

(c)        The Financial Statements which have been heretofore delivered to Lender are true, correct and current in all respects and which fairly present the respective financial conditions of the subjects thereof as of the respective dates thereof; no adverse change has occurred in the financial conditions reflected therein since the respective dates thereof and no borrowings (other than the Loan and Project Loan) which might give rise to a lien or claim against the Mortgaged Property or Loan and Project Loan proceeds have been made by Borrower or others since the date thereof;

(d)        There are no actions, suits or proceedings pending or, to the knowledge of Borrower, threatened against or affecting it, any of the Guarantors, or the Premises, the validity or enforceability of the Mortgage or the priority of the lien thereof at law, in equity or before or

by any Governmental Authorities; to Borrower's knowledge, it is not in default with respect to any order, writ, injunction, decree or demand of any court or Governmental Authorities;

(e)    The consummation of the transactions contemplated hereby and performance of this Agreement and all other Loan Documents have not and will not result in any breach of, or constitute a default under, any mortgage, deed of trust, lease, bank loan or credit agreement, corporate charter, by-laws or other instrument to which Borrower and/or any of the Guarantors is a party or by which any of them may be bound or affected;

(f)    All utility services necessary for the construction of the Improvements and the operation thereof for their intended purposes are or will be available at the boundaries of the Premises, including public water supply, storm and public sanitary sewer, gas, electric power, cable television and telephone facilities;

(g)    Each Requisition submitted to Lender, and the receipt of the funds requested thereby, shall constitute an affirmation that the representations and warranties contained in this Section 5.01 are true and correct as of the date of such Requisition and the date of receipt of such funds;

(h)    It has entered into no contract or arrangement of any kind the performance of which by the other party thereto would give rise to a lien on the Mortgaged Property prior to the Mortgage except for its arrangements with Borrower's Architect, General Contractor and Subcontractors who have filed Lien Waivers or signed payment receipts in form approved by Lender for all payments due under said arrangements as of the end of the period covered by the last Requisition;

(i)    All roads necessary for the full utilization of the Improvements for their intended purposes have either been completed, or the necessary rights of way therefore have been or will be acquired, by appropriate Governmental Authorities or dedicated to public use and accepted by said Governmental Authorities, and all necessary steps have been or will be taken by Borrower and said Governmental Authorities to assure the complete construction and installation thereof no later than the Completion Date or any earlier date required by any law, order or regulation or the Permanent Commitment, if any;

(j)    There exists no default under the Mortgage or any other Loan Document and no event has occurred and is continuing which after notice or the passage of time, or both, would rise to a default thereunder;

(k)    The approved Plans referred to in Section 5.01(b) above are scheduled by sheet number, title, date and revised date in the letter from Borrower's Architect required by paragraph (d) of Section 3.04 hereof, which schedule is hereby certified by Borrower to be true and correct, and are the same as the filed plans referred to in the building permits for the Improvements;

(l)    It has advised the Title Insurer in writing prior to the issuance of the title policy insuring the Mortgage whether any survey, soils-testing, site-development, excavation or other work related to construction of the Improvements was begun or done before the Mortgage was recorded;

(m)     The Premises are not located in an area designated by the Secretary of Housing and Urban Development as having special flood hazards, or, if it is, Borrower has obtained the flood-hazard insurance required by the National Flood Insurance Act of 1968, as amended (42 U.S.C. 4013, et seq.) as amended by the National Flood Insurance Reform Act of 1994 (44 CFR Part 59);

(n)     Attached hereto as Exhibit A and made a part hereof is the Lien Law Statement in conformity with Section 22 of the Lien Law;

(o)     The Premises, the Improvements, and the contiguous areas, are not currently and have never been subject to Hazardous Materials or their effects, except as otherwise is expressly set forth herein;

(p)     There are no claims, litigation, administrative or other proceedings, whether actual or threatened, or judgments or orders, relating to any Hazardous Materials at the Premises or the Improvements;

(q)     The Borrower is a Single Purpose Entity;

(r)     All utility services and facilities necessary for the construction of the Improvements without impediment or delay (including, without limitation, gas, electrical, water and sewage services and facilities) are available or will be available when necessary at or within the boundaries of the Premises, and all utility services necessary for the operation of the Improvements for their intended purposes will be available at or within the boundaries of the Premises when needed;

(s)     Borrower is not now, nor has ever been (i) listed on any Government Lists (as hereinafter defined), (ii) a person who has been determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (September 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC (as hereinafter defined) or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (iv) under investigation by any Governmental Authorities for alleged criminal activity. For purposes hereof, the term "**Patriot Act Offense**" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (A) the criminal laws against terrorism; (B) the criminal laws against money laundering, (C) the Bank Secrecy Act, as amended, (D) the Money Laundering Control Act of 1986, as amended, or (E) the Patriot Act. "Patriot Act Offense" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "**Government Lists**" means (1) the specially designated nationals and blocked persons lists maintained by the Office of Foreign Assets Control ("**OFAC**"), (2) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the rules and regulations of OFAC that Lender notified Borrower in writing is now included in "Government Lists," or (3) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other

Government Authorities or pursuant to any executive order of the President of the United States of America that Lender notified Borrower in writing is now included in "Government Lists;"

(t)     The Individual Guarantor is the sole owner of Borrower, either directly or indirectly;

(u)     The Improvements and Premises are eligible and qualify for the RE Tax Abatement;

(v)     The Condominium is a legally formed and existing condominium pursuant to the Condominium Act; and

(w)     The Premises consists of its own legally separate tax lot.

5.02     Borrower covenants and agrees with Lender that Borrower shall:

(a)     Promptly comply with all laws, ordinances, orders, rules, statutes and regulations of Governmental Authorities applicable to the Premises including, without limitation, the New York State Labor Law, the New York City Zoning Resolution, the New York City Building Code, the New York City Housing Maintenance Code, all applicable federal laws and shall furnish satisfactory evidence of such compliance if requested; or it will timely and at its own expense contest the validity of any such laws, ordinances, orders, rules, statutes and regulations by appropriate legal proceedings and post a sufficient bond or other security satisfactory to Lender in connection with such contest in order to avoid the filing of a lien against the Premises or any part thereof and promptly furnish Lender with reports of any official searches made by Governmental Authorities and any claims of violations thereof; promptly furnish Lender with reports of any official searches made by Governmental Authorities, obtain all permits required from Governmental Authorities and within ten (10) days of receipt of such permits send copies thereof to the Lender;

(b)     Construct the Improvements substantially in accordance with the Plans with reasonable dispatch after the Closing Date in order to have the Improvements, subject to Unavoidable Delay, completed by the Completion Date;

(c)     Permit Lender, its representatives and the Construction Consultant to enter upon the Premises, inspect the Improvements and all materials to be used in the construction thereof and examine all detailed plans and shop drawings which are or may be kept at the construction site; it will cooperate and cause the General Contractor and Major Subcontractors to cooperate with the Construction Consultant to enable it to perform its functions hereunder; at the time of each inspection by the Construction Consultant, make available to Construction Consultant, on demand, daily log sheets covering the period since the immediately preceding inspection showing the date, weather, all subcontractors on the job, number of workers and status of construction;

(d)     Pay when due all costs and expenses required for Completion of the Project and the satisfaction of the conditions of this Agreement, including, without limitation:

(i)     all document and stamp taxes, title examination charges, title insurance premiums, survey charges, departmental and UCC searches, appraisal fees, environmental report fees, inspections, application, commitment and extension fees, recording and filing expenses and fees and commissions lawfully due to brokers in connection with the transactions contemplated hereby or incurred subsequent to the closing of the matters described herein,

(ii)     the fees and expenses of the Construction Consultant, and Lender's Counsel relating to the preparation for the consummation of the transactions contemplated hereby, enforcement of the Loan Documents and conversion of the Loan and Project Loan to Lender's Permanent Loan, and for any services of such third parties which may be required in addition to those normally and reasonably contemplated hereby or incurred subsequent to the Closing Date,

(iii)     any taxes, insurance premiums, flood searches and flood insurance premiums, liens, judgments, security interests or other claims or charges against the Premises or Improvements, and

(iv)     all costs of completion of the work to be performed by Borrower to permit the lawful occupancy of the Improvements for the purposes contemplated by actual or prospective lessees or owners of same as set forth in the individual leases, subleases or contracts thereof or in detailed work letters, any permanent loan commitment, if any, or other agreements or letters of intent with respect thereto, or, in cases where there are no such leases, subleases, contracts, work letters or other documents as aforesaid, as set forth in Borrower's standard work letter or the standard form of lease or contract, if any, required by any provision hereof, or, in cases where none of the foregoing exist, to the level of building standard in accordance with industry practices, as conclusively determined by the Construction Consultant;

(e)     Commence construction of the Improvements no later than thirty (30) days after the closing date of the Initial Advance; submit a Requisition for the initial Direct Costs Loan advance within thirty (30) days after such commencement and subsequent advances on a monthly basis thereafter; cause the construction thus begun to be prosecuted with diligence and continuity in a good and workmanlike manner in accordance with the Plans except during the existence of delays (for not more than thirty (30, or such longer period as agreed to by Lender in writing in Lender's discretion) days) caused by events beyond the Borrower's control which constitute Unavoidable Delays, use only materials, fixtures, furnishings and equipment in connection with construction of the Improvements that are not used or obsolete; complete construction of the Improvements, and the installation of all necessary roads and utilities, in accordance with the Plans, on or before the Completion Date subject to delays which constitute Unavoidable Delay not to exceed more than thirty (30) days of such delays, in the aggregate, or such longer period as agreed to by Lender in writing in Lender's discretion, free and clear of defects and unbonded liens or claims for liens for material supplied or labor or services performed in connection with the construction of the Improvements; time being of the essence as to this subparagraph (e); not make any change or modification to the Plans without the prior written consent of Lender, and submit to Lender three (3) sets of final working drawings for the Plans, each initialed by Borrower's Architect, General Contractor and Borrower, no later than thirty (30) days after the date hereof of the Initial Advance;

(f)    Promptly following the execution of this Agreement, place a sign, at its own expense, on the Premises at a location designated by Lender indicating, among other things, that Lender is providing the "Construction Financing," and containing Lender's address and otherwise conforming to Lender's sign specifications and, complying with all requirements of all Governmental Authorities;

(g)    Receive and deposit in the Building Loan Trust Account all advances made hereunder; hold the same and the right to receive the same as a trust fund for the purpose of paying only the "cost of improvement," as such quoted term is defined in Section 2 of the Lien Law, including payments for such purpose itemized on the Direct Cost Statement and Indirect Cost Statement made by Borrower prior to the Initial Advance but subsequent to the commencement of construction of the Improvements;

(h)    Indemnify and hold harmless Lender against claims of all brokers arising by reason of the execution hereof or the consummation of the transactions contemplated hereby, it being understood and agreed that Lender shall have no obligation for the payment of any such commissions or fees of any kind;

(i)    Upon request and with reasonable promptness, deliver to Lender and/or the Construction Consultant copies of all contracts, bills of sale, statements, receipted vouchers or agreements under which Borrower claims title to any materials, fixtures or articles incorporated in the Improvements or subject to the lien of the Mortgage, or under which it has incurred costs for which it is entitled to a Loan advance, and deliver to Lender such other data or documents in connection with the Improvements as Lender may from time to time request;

(j)    Upon demand of Lender or the Construction Consultant, correct any defects (including structural) in the Improvements, which Lender and the Construction Consultant reasonably determine, in their sole and absolute discretion, to be material or any departures from the Plans not approved by Lender;

(k)    Not permit the performance of any work pursuant to the General Contract, Change Order or Plans until Lender and the Construction Consultant, (i) shall have received copies thereof and (ii) in the case of Plans or Change Orders which will result in (A) an increase in the fee due General Contractor pursuant to the General Contract in excess of the Change Order Amount or which, together with the aggregate of Change Orders theretofore executed by Borrower will result in a change in such amount in excess of the Aggregate Change Order Amount or (B) a change in the character of the Improvements, shall have given specific written approval thereof; it being understood that approval of any Plans or Change Order will not obligate Lender to increase or advance any Loan Budget Amount on account of any such Plans or Change Order;

(l)    Require covenants from the General Contractor to the same effect as the covenants made by Borrower in the immediately preceding paragraph; provide in the General Contract that the General Contractor will deliver to Lender or the Construction Consultant, upon request, copies of the General Contract, Change Orders and any other contract, purchase order or subcontract covering labor, materials, equipment or furnishings to or for the Improvements, and the names of all persons with whom the Borrower or General Contractor has contracted or

intends to contract for the construction of the Improvements or for the furnishing of labor or materials therefor;

(m)     Employ suitable means to protect from theft or vandalism all portions of the Improvements and all tools and building materials stored on the Premises;

(n)     Comply with all restrictions, covenants and easements affecting the Premises or the Improvements and cause the satisfaction of all conditions of this Agreement;

(o)     Deem the submission of any Requisition after the date hereof, and the receipt of the funds requested thereby, as an affirmation by Borrower that the representations and warranties of Borrower set forth in Section 5.01 of this Agreement remain true and correct as of the respective dates thereof, and Lender shall be entitled to rely thereon in making any advance in accordance with such Requisition;

(p)     Not sell, convey, assign, transfer or lease of the Premises or any part or parts thereof without the prior written consent of the Lender;

(q)     Submit to Lender, upon Lender's demand, a list of all Subcontracts not less than ten (10) days after Lender's request therefor;

(r)     Subordinate to the lien of the Mortgage any loans made (i) by the Borrower to any other entity owned or controlled by the principals of the Borrower or (ii) by any entity owned or controlled by the principals of the Borrower to the Borrower and to deliver to Lender any and all agreements and or other documents requested by Lender and Lender's Counsel in connection with such subordination which documents and agreements shall be satisfactory in all respects to Lender and Lender's Counsel, provided, however, that nothing in this subparagraph shall be deemed to conflict with or contradict or otherwise permit any action expressly prohibited by subsections 6.01(n) and (u);

(s)     Deliver to Lender the Financial Statements with respect to Borrower, and, cause to be delivered to Lender the Financial Statements with respect to each Guarantor;

(t)     Deposit any and all security deposits received pursuant to the leases of the Premises or any part thereof in an account maintained with Lender, and execute and deliver any further documentation requested by Lender promptly after being requested to do so to assign to Lender Borrower's interest in and to any leases and the security deposits received thereunder.

(u)     Comply with all of the provisions of its certificate of incorporation, articles of organization, certificate of limited partnership, as the case may be, and all other organizational documents affecting Borrower, and not modify same without Lender's prior written consent;

(v)     Borrower shall indemnify and hold harmless Lender from the payment of any and all mortgage recording taxes, transfer taxes and/or sales taxes related to the acquisition of the Premises and the construction of the Improvements;

(w)     Individual Guarantor shall own, directly or indirectly, at all times not less than one hundred percent (100%) of the membership interest in the Borrower;

(x)     Comply with all Americans with Disabilities Act of 1990 ("**ADA**") (Pub. L. 101-336), as amended, as it relates to the Improvements;

(y)     In addition to the Building Loan Trust Account and the Operating Account, Borrower shall establish and maintain with Lender, while any amounts are due hereunder or under the Note, all bank accounts relating to the Improvements and the construction thereof, including, without limitation, all project operating accounts, escrow accounts, and development accounts all of which Borrower pledges to Lender hereunder as additional collateral for the Loan and Project Loan;

(z)     Borrower agrees that if the proceeds of the Permanent Loan are insufficient to repay the Loan, Borrower shall pay any deficiency from its own funds and Lender shall have no obligation to provide any Loan or Project Loan proceeds or any other funds to cover such deficiency;

(aa)     Borrower shall maintain in full force and effect all of the policies of insurance required by this Agreement and/or the Mortgage;

(bb)     Comply with and cause the General Contractor to comply with the Construction Contracts Act, which is Article 35-e of the General Business Law of New York;

(cc)     Contribute any payments to be made pursuant to <u>Section 7.01(e)</u> hereof, separate and apart from the Loan, Project Loan and Borrower's Equity  at such time and times as Lender shall determine in its sole discretion;

(dd)     Without the Lender's prior written consent, not amend, supplement or otherwise modify the Architect's Agreement or the General Contract (1) to materially increase the amount payable by the Borrower thereunder, (2) to materially lengthen the time for performance of any party thereto other than the Borrower or (3) in any other way that could materially adversely affect the Lender;

(ee)     Deliver to Lender copies of all notices and communications received from the General Contractor with respect to the Improvements simultaneously with receiving same;

(ff)     Borrower shall use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Premises, including those relating to money laundering and terrorism.  Lender shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Premises, including those relating to money laundering and terrorism; in the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Lender may, at its option, cause Borrower to comply therewith and any and all costs and expenses incurred by Lender in connection therewith shall be secured by the Loan Documents and shall be immediately due and payable; and

(gg)     Borrower shall do all things necessary to obtain and maintain the Real Estate Tax Abatement.

-38-

# ARTICLE 6

## Events of Default and Remedies

6.01        The occurrence of any one or more of the following events shall constitute an event of default (individually, an "**Event of Default**", collectively, "**Events of Default**") hereunder:

(a)        if the Borrower fails to pay or expend promptly when due or required any sum of money due or required to be paid or expended under this Agreement, the Note, the Mortgage or any other Loan Document and such failure to pay continues for a period of ten (10) days;

(b)        if the Borrower and/or any of the Guarantors fails for thirty (30) days after the giving to it, him or her, as applicable, by the Lender of written notice to comply with any covenants or agreements made by it, him or her, as applicable, in this Agreement or any other Loan Document, other than a covenant to pay or expend any sum of money, or if Borrower and/or any of the Guarantors otherwise fails to comply with any terms or conditions of this Agreement, provided, however, that if, in Lender's reasonable judgment said failure to comply is not capable of being cured within said thirty (30) day period and is not curable by the payment of money, then

(1)        the Borrower and the Guarantors shall have such additional time as Lender deems necessary to cure such failure (but such extension of time to cure shall not be deemed a waiver of the conditions set forth in Section 4.01(f) of this Agreement) provided that (i) Borrower, and/or any of the Guarantors promptly proceed to commence curing said failure to comply upon receipt of notice of said failure from Lender, (ii) in the judgment of Lender, Borrower, and/or any of the Guarantors thereafter diligently and continuously proceed to cure said failure so as to cure said failure in the shortest time possible, (iii) such additional time to cure does not impair any rights and/or remedies of Lender and will not adversely affect the completion of the Improvements by the Completion Date, subject to any Unavoidable Delay, not to exceed thirty (30) days in the aggregate, and (iv) the Borrower, and any of the Guarantors furnish to Lender, upon demand of Lender, such documents and information with respect to Borrower's and/or any of the Guarantors' curing of said failure to comply, as Lender may request; or

(2)        the Borrower shall have thirty (30) days to provide additional collateral to cure such default, which collateral shall be reasonably satisfactory to Lender in its sole and absolute discretion; or

(3)        the Borrower shall have thirty (30) days to reduce the outstanding amount of the Loan and Project Loan to an amount reasonably acceptable to Lender in its sole and absolute discretion;

(c)        if a default which remains uncured after applicable periods of notice and grace shall occur under any other Loan Document or under any other agreement between Borrower and Lender or between any of the Guarantors and Lender;

(d)     if at any time any representation or warranty made by the Borrower herein shall be incorrect or if any such representation or warranty at a time when it is required under any of the Loan Documents to continue to be true and correct shall become untrue or incorrect in any way and the Borrower shall fail to remedy such situation within thirty (30) days after notice from the Mortgagee (or as promptly as is commercially practicable upon notice in case of emergency);

(e)     if the construction of the Improvements is not carried on with reasonable dispatch or at any time be discontinued for a period of twenty (20) consecutive Business Days or more for reasons within the control of the Borrower or for thirty (30) calendar days or more when occasioned by Unavoidable Delay, or such longer period as lender shall agree to in writing in Lender's discretion; provided, however, that in no event shall the aggregate of all such periods equal more than sixty (60) calendar days, with time of the essence, or such longer period as lender shall agree to in writing in Lender's discretion;

(f)     if the Lender or its representatives, or the Construction Consultant, or its representatives be not permitted at all reasonable times, to inspect the Premises and Improvements and to enter upon the Premises, inspect the Improvements and the construction thereof and all materials, fixtures and articles used or to be used in the construction and to examine all the Plans, or if the Borrower shall fail within five (5) days to furnish to the Lender or its authorized representative, when requested, copies of the current Plans and, if Lender shall not be permitted to inspect the books and records of Borrower, with respect to the Premises and the Improvements;

(g)     if any of the materials, fixtures or articles of personal property used in the construction of the Improvements or the appurtenances thereto, or to be used in the operation thereof, be not in substantial accordance with the Plans as approved by the Lender and said failure of any materials, fixtures, or articles of personal property used in the construction of the Improvements to be in substantial accordance with the Plans as approved by Lender remains uncured for thirty (30) days after the giving of written notice to Borrower by Lender;

(h)     if the Borrower executes any conditional bill of sale, chattel mortgage or other security instrument covering any furniture, furnishings, fixtures and equipment intended to be incorporated in the Improvements or the appurtenances thereto, or covering articles of personal property placed in or on the Improvements, or files a financing statement publishing notice of such security instrument, or purchases any of such furniture, furnishings, fixtures and equipment so that ownership of the same will not vest unconditionally in the Borrower free from encumbrances, on delivery to the Premises; or if the Borrower does not produce to the Lender, upon demand, the contracts, bills of sale, statements, receipted vouchers or agreements, or any of them, under which the Borrower claims title to such materials, fixtures and articles;

(i)     if the Borrower and General Contractor do not disclose to the Lender and the Construction Consultant, within seven (7) days of a request by Lender, the names of any Subcontractors with whom the Borrower and/or General Contractor contracted for the construction of the Improvements or for the furnishing of labor or materials thereof;

(j)  if the Borrower fails or is unable, in the reasonable judgment of the Lender, to complete the Improvements on or before the Completion Date, as the same may be extended by the aggregate periods of permitted Unavoidable Delay or other delays approved by Lender;

(k)  if the Borrower is unable to satisfy any condition of its right to the receipt of an advance hereunder for a period in excess of thirty (30) calendar days following the date of submission of a Requisition;

(l)  if a lien for the performance of work or supply of materials is filed against the Premises or any part thereof and remains unsatisfied or unbonded and undischarged of record at the time any Requisition is submitted or an advance thereunder is to be made, or for a period of forty-five (45) days after the date of filing thereof;

(m)  if any of the following events occur: (i) if by order of a court of competent jurisdiction, a receiver, liquidator or trustee of the Borrower or any of the Guarantors or of any of its, his, her or their properties, shall be appointed and shall not have been discharged within forty-five (45) days, or (ii) if any of the creditors of the Borrower or any of the Guarantors shall commence against the Borrower or any of the Guarantors an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect and if such case shall not be discharged or dismissed within forty-five (45) days after the date on which such case was commenced, or (iii) if the Borrower or any of the Guarantors is adjudicated bankrupt or insolvent or a petition for reorganization is granted (without regard for any grace period provided for herein), or (iv) if there is an attachment or sequestration of any of the property of the Borrower or any of the Guarantors and same is not discharged or bonded within sixty (60) days, or (v) if the Borrower or any of the Guarantors shall commence a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, now or hereafter in effect, relating to the reorganization of the Borrower or any of the Guarantors or the arrangement or readjustment of the debts of the Borrower or any of the Guarantors, or (vi) if the Borrower or any of the Guarantors shall make any assignment for the benefit of its, his, hers or their creditors or shall admit in writing its inability to pay its, his or her debts generally as they become due or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of the Borrower or any of the Guarantors or of any part of its, his, her or their property, or if the Borrower or any of the Guarantors shall fail generally to pay its, his, her or their debts as such debts become due, or if the Borrower or any of the Guarantors shall take any action in furtherance of any of the foregoing;

(n)  if the Premises, the Improvements, or any part thereof or any interest therein or in Borrower is sold, conveyed, assigned, leased or transferred without the prior written consent of the Lender;

(o)  if there is a material adverse change in the identity, control or financial condition of the Borrower or Premises or if there are any material changes that have not been approved by Lender in the Plans, the Improvements, or the Premises;

-41-

(p)     if there is a material adverse change in the financial condition of any one or more of the Guarantors;

(q)     if Individual Guarantor shall die, and the Borrower does not within sixty (60) days of such death and prior to any disposition of the assets of the estate of Individual Guarantor, deliver to the Lender (i) an assumption agreement executed by the estate of the deceased Individual Guarantor whereby the estate assumes the liabilities and obligations of Individual Guarantor to the Lender, in form and substance satisfactory to the Lender, together with an opinion of counsel, satisfactory to Lender, that such assumption was duly executed and is valid, binding and enforceable against the estate or (ii) a replacement guarantor with a net worth equal to or greater than the net worth of the deceased Individual Guarantor to execute a guaranty identical in form and substance to the guaranty executed by such deceased Individual Guarantor together with any and all information with respect to such replacement guarantor as requested by Lender, which information and such replacement guarantor shall be satisfactory to Lender in its sole discretion;

(r)     if the Borrower fails to pay or cause to be paid, before the same shall become delinquent, together with any fine, penalty, interest or cost that may be added thereto, all franchise taxes of the Borrower, or real estate taxes, assessments, water rates and charges, and other governmental charges, general and special, ordinary and extraordinary, foreseen as well as unforeseen, of any kind and nature whatsoever, including, but not limited to, assessments for public Improvements or benefits which are assessed, levied, confirmed, imposed or become a lien upon the Premises or become payable while any portion of the Loan or Project Loan remains outstanding or the Borrower enters into any agreement, whether written or oral, which has the effect of deferring the payment of any tax or other charges which are or can be assessed, levied, confirmed, imposed or become a lien on the Premises or become payable;

(s)     if the Borrower or any of the Guarantors ceases to do business or terminates its, his, her or their business for any reason whatsoever or shall cause or institute any proceeding for the dissolution or termination of the Borrower or any of the Guarantors;

(t)     if the Borrower fails to maintain in full force and effect all of the policies of insurance required by this Agreement and/or the Mortgage;

(u)     if the Borrower encumbers, alienates, hypothecates, grants a security interest in, mortgages or grants any other interest whatsoever in the Premises, the Improvements or the Mortgaged Property, or any interest in Borrower, directly or indirectly, other than as permitted herein, or any part thereof or any right, title or interest in this Agreement or any proceeds of the Loan or Project Loan without the prior written consent of the Lender, which may be granted or withheld by Lender in its sole discretion;

(v)     if Borrower is in default beyond applicable notice and cure periods under the General Contract;

(w)     if there is a "change of control" of Borrower or General Contractor, whereby more than ten percent (10%) of any such entity is sold, conveyed or transferred to any person not holding an interest in same as of the date hereof;

(x)      if Individual Guarantor at anytime owns, directly or indirectly, less than one hundred percent (100%) of the membership interest in Borrower;

(y)      if any execution, warrant, attachment, garnishment or other similar processes shall be levied or filed against the Mortgaged Property or any part thereof which involve claims aggregating more than $10,000 and such processes shall not be stayed, bonded, vacated or discharged within forty-five (45) days after Borrower receives notice hereof;

(z)      if Borrower fails to comply with and cause General Contractor to comply with the Construction Contracts Act, which is Article 35-e of the General Business Law of New York or any other applicable law affecting the Improvements;

(aa)     if Borrower fails to cause the accounts identified in Sections 3.02(n) and 5.02(t) of this Agreement to be maintained during the term of the Loan;

(bb)     if the Borrower and/or the General Contractor assign the General Contract or any of their respective rights and/or obligations thereunder without the prior written consent of the Lender;

(cc)     if at any time Borrower is not a Single Purpose Entity;

(dd)     if there is a default or failure to comply with the terms of the Letter of Credit and Reimbursement Agreement by and between Lender and River Rock LLC dated as of the Closing Date;

(ee)     if the Premises does not qualify for the Real Estate Tax Abatement; or

(ff)     if the Condominium is not a legally valid condominium formed pursuant to the Condominium Act.

6.02     The Lender shall have the right upon the happening of any such Event of Default under this Agreement, to declare the indebtedness evidenced by the Note, together with all sums required to be paid under the terms hereof and/or of the Mortgage and/or of any other Loan Document, immediately due and payable.

6.03     Upon the happening of an Event of Default under this Agreement after any applicable notice and cure periods, in addition to any other rights and/or remedies available to Lender under the Mortgage, the Guaranty, this Agreement, any other Loan Document or by law, Lender also shall have the right, and is hereby given an irrevocable license, to enter, or to cause the Construction Consultant or another independent contractor of Lender's selection to enter, the Premises, the Improvements or any part thereof and perform any and all work and labor necessary to complete the Improvements substantially in accordance with the Plans and employ watchmen to protect the Premises and the Improvements; all sums expended by the Lender for such purposes shall be deemed to have been paid to the Borrower, evidenced by the Note and secured by the Mortgage. The Lender shall have the right at any and all times to discontinue any work commenced by it in respect of the Improvements or to change any course of action undertaken by it and shall not be bound by any limitations or requirements of time whether set forth herein or otherwise. The Lender shall have the right and power (but shall not be obligated)

to assume any design or construction contract made by or on behalf of the Borrower in any way relating to the Improvements and to take over and use all or any part or parts of the labor, materials, supplies and equipment contracted for by or on behalf of the Borrower, whether or not previously incorporated into the Improvements, all in the sole and absolute discretion of the Lender. In connection with any construction of the Improvements undertaken by the Lender pursuant to the provisions of this subsection, the Lender may (a) engage builders, contractors, architects, engineers and others for the purpose of furnishing labor, materials and equipment in connection with any construction of the Improvements, (b) pay, settle or compromise all bills or claims that may become liens against the Premises, or any portion thereof, or that have been or may be incurred in any manner in connection with the construction, completion and equipment of the Improvements or for the discharge of liens or other defects in the title of the Premises, and (c) take such other action (including the employment of watchmen to protect the Improvements) or refrain from acting under this Agreement as the Lender may in its sole and absolute discretion from time to time determine without any limitation whatsoever. The Borrower shall be liable to the Lender for all sums paid or incurred for the construction, completion and equipping of the Improvements, whether the same shall be paid or incurred pursuant to the provisions of this Section 6.03 or otherwise, and all payments made or liabilities incurred by the Lender under this Agreement or any of the Loan Documents of any kind whatsoever shall be paid by the Borrower to the Lender upon demand with interest at the Involuntary Rate from the date paid by Lender to the date of payment to the Lender, and all of the foregoing, including interest, shall be deemed and shall constitute advances under this Agreement and be secured by the Loan Documents. Upon the occurrence of any Event of Default, the rights, powers and privileges provided in this Section 6.03 and all other remedies available to the Lender under this Agreement may be exercised by the Lender at any time and from time to time whether or not the indebtedness evidenced by the Note and secured by the Mortgage shall be declared by the Lender to be due and payable, and whether or not the Lender shall have instituted any foreclosure or other action for the enforcement of the Mortgage.

6.04     For the purposes set forth in Section 6.03 above, the Borrower hereby constitutes and appoints the Lender as Borrower's true and lawful attorney-in-fact with full power of substitution, effective upon the occurrence and during the continuance of an Event of Default, to complete the Improvements in the name of the Borrower, and hereby empowers said attorney or attorneys as follows: to make such additions and changes and corrections in the Plans which shall be necessary or desirable to complete the Improvements in substantially the manner contemplated by the Plans; to use any funds of the Borrower including any balance which may be held in escrow or in any account maintained with Lender and any funds which may remain unadvanced under this Agreement for the purpose of completing the Improvements in the manner called for by the Plans as may be modified hereby; to employ such contractors (including, without limitation, General Contractor), subcontractors, agents, architects and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims which are or may be liens against the Premises or any part thereof, or may be necessary for the completion of the Improvements or the clearance of title; to execute all applications and certificates in the name of the Borrower which may be required by any construction contract; and to do any and every act with respect to the construction of the Improvements which the Borrower may do in its own behalf. It is understood and agreed that this power of attorney shall be deemed to be a power coupled with an interest which cannot be revoked. Said attorney-in-fact shall also have power to prosecute and defend all actions or

proceedings in connection with the construction of the Improvements on the Premises and to take such action and require such performance as is deemed necessary. The Borrower hereby assigns and quitclaims to the Lender all sums advanced pursuant to either this Section and/or Section 6.03 above and all sums in escrow. Entering the Premises in order to complete the Improvements and/or exercise of the aforesaid license and/or power-of-attorney will not exclude the Borrower from possession, custody, ownership or control of the Premises or Improvements or of any rents, issues or profit therefrom.

6.05       If the Borrower shall fail to perform any of the covenants contained in Section 7.01(e) of this Agreement, the Lender may at its option make advances to perform the same in its behalf, and all sums so advanced shall be deemed to have been paid to Borrower, evidenced by the Note and secured by the Mortgage. The Borrower will repay on demand of the Lender all sums so advanced pursuant to this Section 6.05 with interest at the Involuntary Rate. The provisions of this Section 6.05 shall not prevent any default in the observance of any covenant contained in said Section 7.01(e) of this Agreement from constituting an Event of Default.

# ARTICLE 7

## General Conditions

7.01          The following conditions shall be applicable at all times:

(a)          This Agreement is subject to the trust fund provisions of the Lien Law, including, without limitation, Section 13 thereof.

(b)          Any advance by Lender of Loan proceeds hereunder made prior to or without the fulfillment by Borrower of all of the conditions precedent thereto, whether or not known to Lender, shall not constitute a waiver by Lender of the requirement that all conditions, including the non-performed conditions, shall be required with respect to all future advances.

(c)          All documentation and proceedings deemed by Lender or Lender's Counsel to be necessary or required in connection with this Agreement and the documents relating hereto shall be subject to the prior approval of, and satisfactory to, Lender and Lender's Counsel as to form and substance.  In addition, the persons or parties responsible for the execution and delivery of, and signatories to, all of such documentation, shall be acceptable to, and subject to the approval of, Lender and Lender's Counsel.  Lender or Lender's Counsel shall receive copies (certified if requested by either of them) of all documents which they may require in connection with the transaction contemplated hereby.

(d)          Lender shall, at all times, be free to independently establish to its satisfaction and in its absolute discretion the existence or nonexistence of any fact or facts the existence or nonexistence of which is a condition of this Agreement or Lender's performance hereunder.

(e)          If at any time Lender notifies Borrower that, in Lender's sole judgment in consultation (in connection with Direct Costs) with the Construction Consultant, the undisbursed balance of the Loan, Project Loan and Borrower's Equity is insufficient to pay the remaining Direct Costs, Indirect Costs and Project Costs, Borrower shall either (i) deposit with Lender an amount equal to such deficiency which Lender may from time to time apply, or allow Borrower to apply, to such Direct Costs, Indirect Costs and Project Costs or (ii) pay for such Direct Costs, Indirect Costs and Project Costs in the amount of such deficiency so that the amount of the Loan, Project Loan and Borrower's Equity which remains to be disbursed shall be sufficient to complete the Improvements, and Borrower shall furnish Lender with such evidence thereof as Lender shall require.  Borrower hereby agrees that Lender shall have a lien on and security interest in any sums deposited pursuant to clause (i) above and that Borrower shall have no right to withdraw any such sums except for the payment of the aforesaid Direct Costs, Indirect Costs and Project Costs as approved by Lender.  Any such sums not used as provided in said clause (i) shall be released to Borrower when and to the extent that Lender determines that the amount thereof is more than the excess, if any, of the total remaining costs of completion of the Improvements over the undisbursed balance of the Loan, Project Loan and Borrower's Equity, provided, however, that should an Event of Default occur, Lender may, at its option, apply such amounts either to the costs of completion of the Improvements or to the immediate reduction of outstanding principal and/or interest under the Note.

(f)     During the existence of any Event of Default hereunder or under the Mortgage or under any other Loan Document, Borrower does hereby irrevocably authorize Lender to advance any undisbursed Loan proceeds directly to the General Contractor and/or any one or more of the Subcontractors, and/or any other Persons or entities to pay for completion of the Improvements, but Lender is under no obligation to do so.   No further direction or authorization from Borrower shall be necessary to warrant such direct advances and all such advances shall satisfy pro tanto the obligations of Lender hereunder and shall be secured by the Building Mortgage, as applicable, as fully as if made to Borrower regardless of the disposition thereof by General Contractor or any Subcontractor or other Person.

(g)     This Agreement is solely for the benefit of Lender, and Borrower.   All conditions of the obligations of Lender to make advances hereunder are imposed solely and exclusively for the benefit of Lender and may be freely waived or modified in whole or in part, by Lender at any time if in its sole discretion it deems it advisable to do so, and no Person other than Borrower (provided, however, that all conditions have been satisfied) shall have standing to require Lender to make any Loan advances or to be a beneficiary of this Agreement or any advances to be made hereunder.   Any waiver or modification asserted by Borrower to have been agreed to by Lender must be in writing and comply with the provisions of subparagraph (j) of this Section 7.01.

(h)     Borrower hereby irrevocably authorizes Lender to disburse proceeds of the Loan or Project Loan to pay interest accrued on the Note as it comes due, or to satisfy any of the conditions of this Agreement, including, without limitation, the payment of the reasonable fees and expenses of Lender's Counsel and the Construction Consultant related to the Loan or Project Loan, notwithstanding that Borrower may not have requested disbursement of such amounts and whether or not Borrower may be in default under the Mortgage.   Any such disbursements shall be added to the outstanding principal balance of the Note and shall be secured by the Mortgage. The authorization granted hereby shall not prevent Borrower from paying interest, or satisfying said conditions, from its own funds and shall in no event be construed so as to relieve Borrower from its obligation to pay interest as and when due under the Note, or to satisfy said conditions, or to obligate Lender to disburse Loan or Project Loan proceeds for the payment of interest or the satisfaction of said conditions.

(i)     All notices, requests or other communications hereunder shall be in writing and shall be deemed to have been given on the date of delivery (or first attempted delivery if delivery is rejected or unable to be made on a Business Day) when presented either personally against signed receipt, or sent by Federal Express, or three (3) Business Days after being sent by United States Registered or Certified Mail, return receipt requested, postage prepaid, if to Borrower at its address stated on the cover page hereof, Attention: Joseph Norton, with a copy sent simultaneously and in the same manner to Goldstein Hall PLLC, 44 Wall Street, 12th Floor, New York, New York 10005, Attention:  Matthew Hall, Esq., and if to Lender, at its address stated on the cover page hereof, Attention:  Jacqueline Lawrence G. Hammond with a copy sent simultaneously and in the same manner to Lender's Counsel, Attention:  Kevin C. George, Esq. or at such other address within the United States of America as any such party shall, by notice to the other party, specify.

(j)     No provision of the Note, Mortgage, Guaranty, this Agreement, any other Loan Document or any other document executed pursuant hereto may be changed, waived, discharged or terminated orally, by telephone or by any other means except an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

(k)     Except as herein provided, this Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, personal representatives, trustees, successors and assigns. Notwithstanding the foregoing, Borrower, without the prior written consent of Lender in each instance, may not assign, transfer or set over to another, in whole or in part, all or any part of its benefits, rights, duties and obligations hereunder, including, but not limited to, performance of and compliance with conditions hereof and the right to receive the proceeds of current or future advances.

(l)     Borrower agrees that, by its acceptance of any advance of Loan proceeds under this Agreement, it shall be bound in all respects by the Requisition submitted on its behalf in connection therewith with the same force and effect as if Borrower had itself executed and submitted the Requisition and whether or not the Requisition is executed and/or submitted by an authorized Person.

(m)     Any and all advances made at any time by Lender pursuant to the irrevocable authorizations granted by paragraphs (f), (h) and (n) of this Section 7.01 shall require no further direction, authorization or request for disbursement from Borrower. Borrower agrees that advances made pursuant to paragraph (g) of this Section 7.01, may be made whether or not there exists a default under the Mortgage and without any further direction, authorization or request for disbursement from Borrower. Any and all such disbursements made pursuant to paragraphs (f), (g), (h) or (n) of this Section 7.01 shall be added to the outstanding principal balance evidenced by the Note and shall be secured by the Mortgage.    The aforesaid authorizations shall    (1) not prevent Borrower from paying the General Contractor, Subcontractors and other Persons, from paying the interest, or from satisfying the conditions and obligations referred to in said paragraphs, out of its own funds, (2) in no event be construed so as to relieve Borrower or others from their obligations to pay General Contractor, such Subcontractors or other Persons, to pay interest as and when due under the Note, or to satisfy such conditions and obligations and (3) in no event obligate Lender to disburse Loan or Project Loan proceeds for any such purposes.

7.02     The cover page and the Exhibits and the Schedules annexed hereto are incorporated as a part of this Agreement with the same effect as if set forth in the body hereof.

7.03     Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other security document which is not of public record, and, in the case of any such destruction or mutilation, upon cancellation of the Note or other security document, Borrower will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

7.04     All payments due hereunder and/or under the Note shall be made by Borrower to Lender at 120 Broadway, 16th Floor, New York, New York 10271 for such other

place as Lender may from time to time specify in writing in lawful currency of the United States of America in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments.

7.05 Lender may at any time pledge or assign all or any portion of its rights under the Loan Documents to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or assignment or enforcement thereof shall release Lender from its obligations under any of the loan documents which evidence and/or secure the Loan.

7.06 Borrower hereby grants to Lender, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to Lender whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender or any entity under the control of, under common control or affiliated with Lender and its successors and/or assigns, or in transit to any of them. At any time following the occurrence of an Event of Default, without demand or notice (any such notice being expressly waived by Borrower), Lender may setoff the same or any part thereof and apply the same to any liability or obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral security for the Loan. **ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

7.07 **BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS EVIDENCING AND/OR SECURING THE LOAN, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS AGREEMENT AND MAKE THE LOAN.**

7.08     All agreements between Borrower and Lender are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the indebtedness evidenced by the Note or otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the indebtedness evidenced by the Note exceed the maximum permissible under applicable law.  As used herein, the term "applicable law" shall mean the law in effect as of the date hereof; provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then the Note shall be governed by such new law as of its effective date.  In this regard, it is expressly agreed that it is the intent of Borrower and Lender in the execution, delivery and acceptance of the Note to contract in strict compliance with the laws of the State of New York from time to time in effect. If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the Loan Documents at the time of performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from circumstances whatsoever Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest.  This provision shall control every other provision of all agreements between Borrower and Lender.

7.09     All payments received by Lender hereunder shall be applied first to the payment of all fees, expenses and other amounts due to Lender (excluding principal and interest), then to accrued interest, and the balance on account of outstanding principal; provided, however, that after an Event of Default hereunder, payments will be applied to the obligations of Borrower to Lender as Lender determines in its sole discretion.

7.10     If any payment under the Note (including on the Maturity Date) becomes due on a day which is not a Business Day (as defined below), the Maturity Date or payment shall be extended to the next succeeding Business Day, and such extension of time shall be included in computing interest and fees in connection with such payment.  As used herein, "**Business Day**" shall mean any day other than a Saturday, Sunday or day which shall be in the State of New York a legal holiday or day on which banking institutions are required or authorized to close.

7.11     Borrower shall pay on demand all expenses of Lender in connection with the preparation, administration, default, collection, waiver or amendment of Loan or Project Loan terms, or in connection with Lender's exercise, preservation or enforcement of any of its rights, remedies or options hereunder, including, without limitation, fees of outside legal counsel or the allocated costs of in-house legal counsel, accounting, consulting, brokerage or other similar professional fees or expenses, and any fees or expenses associated with travel or other costs relating to any appraisals or examinations conducted in connection with the Loan or Project Loan or any collateral therefor, and the amount of all such expenses shall, until paid, bear interest at the rate applicable to principal hereunder (including the Involuntary Rate) and be an obligation secured by any collateral.

7.12     With respect to any investment security, certificate of deposit or deposit account (the "**Account**") referred to herein and made by Borrower in connection with the Loan or Project Loan, the Borrower agrees that Lender may transfer any proceeds of the Account into its name or that of its nominee and may receive the income and any distributions thereon and

hold the same as collateral for the Indebtedness, as that term is defined in the Mortgage, or apply the same to any Indebtedness, as that term is defined in the Mortgage, whether to not a default or an Event of Default has occurred.

       7.13       Lender shall have the unrestricted right at any time and from time to time, and without the consent of or notice or cost to Borrower or any Guarantor, to grant to one or more banks or other financial institutions (each, a "**Participant**") participating interests in Lender's obligation to lend hereunder and/or the Loan and Project Loan. Lender may furnish any information concerning Borrower, any Guarantors, the Loan and Project Loan, the Premises and the Improvements in its possession from time to time to prospective Participants, including without limitation, all Loan Documents, Financial Statements, appraisals, Hazardous Waste Reports and all other data.

       7.14       Lender shall have the unrestricted right at any time or from time to time, without Borrower's consent, to assign all or any portion of its rights and obligations hereunder to one or more banks or other financial institutions (each, an "**Assignee**"), and Borrower agrees that it shall execute or cause to be executed, such documents, including without limitation, amendments to this Agreement and to any other documents, instruments and agreements executed in connection herewith as Lender shall reasonably deem necessary to effect the foregoing. In addition, at the request of Lender and any such Assignee, Borrower shall issue one or more new promissory notes, as applicable, to any such Assignee, and if Lender has retained any of its rights and obligations hereunder following such assignment, to Lender, which new promissory notes shall be issued in replacement of, but not in discharge of, the liability evidenced by the promissory note held by Lender prior to such assignment and shall reflect the amount of the respective commitments and loans held by such Assignee and Lender after giving effect to such assignment. Upon the execution and delivery of appropriate assignment documentation, amendments and any other documentation required by Lender in connection with such assignment, and the payment by Assignee of the purchase price agreed to by Lender and such Assignee, such Assignee shall be a party to this Agreement and shall have all of the rights and obligations of Lender hereunder (and under any and all other guaranties, Loan Documents, instruments and agreements executed in connection herewith) to the extent that such rights and obligations have been assigned by Lender pursuant to the assignment documentation between Lender and such Assignee, and Lender shall be released from its obligations hereunder and thereunder to a corresponding extent. Borrower may furnish any information concerning Borrower, any Guarantors, the Loan and Project Loan, the Premises and the Improvements in its possession from time to time to prospective Assignees. If an Assignee is not a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code of 1986, as amended) for United States federal income tax purposes (a "**Non-U.S. Lender**") such Assignee shall, as a condition precedent to its being made a party hereto, agree that it will deliver to each of the Borrower and the Lender, on or prior to the date that any Non-U.S. Lender becomes an Assignee after the date hereof, two duly completed copies of (i) United States Internal Revenue Service ("**IRS**") Form W-8, W-8BEN or W-8ECI (or any successor forms), certifying that such Non-U.S. Lender is entitled to a complete exemption from United States federal withholding tax with respect to interest payments to be made under this Agreement and the applicable Note or (ii) other appropriate successor IRS forms. Each Non-U.S. Lender that so delivers a Form W-8, W-8BEN, W-8ECI or other appropriate form further undertakes to deliver to each of the Borrower and the Lender two additional copies of such form (or appropriate successor form) on

or before the date that such form expires or becomes obsolete or promptly after the occurrence of any event requiring a change in the most recent form so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by the Borrower or the Lender, unless an event (including any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required that renders all such forms inapplicable and such Non-U.S. Lender advises the Borrower and the Lender that is will not be delivering any such form. The Borrower shall not be required to pay any additional amounts to any Non-U.S. Lender in respect of United States federal withholding tax pursuant to provisions in the Note (or any other section relating to payments net of taxes) to the extent that (i) the obligation to pay such additional amounts would not have arisen but for a failure by such Non-U.S. Lender to comply with the provisions of this section, or (ii) the obligation to withhold amounts with respect to United States federal withholding tax existed on the date such Non-U.S. Lender became a party to this Agreement. If any Non-U.S. Lender shall claim any additional amounts payable pursuant to provisions in the Note, it shall use reasonable efforts to change the jurisdiction of its applicable lending office if such change would avoid the need or reduce the amount of any such additional amounts which may thereafter accrue. If a Non-U.S. Lender shall become aware that it is entitled to claim a refund of tax from the jurisdiction to which the tax was paid to which such Non-U.S. Lender would not be entitled but for such payment net of taxes paid pursuant to a Note, it shall promptly notify the Borrower in writing of the availability of such refund claim and shall, within thirty (30) days after receipt of a written request by the Borrower, make a claim to such jurisdiction for such refund. If Lender receives a refund of any such tax, it shall within thirty (30) days from the date of such receipt pay over such refund to the Borrower.

7.15     **BORROWER AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR ANY FEDERAL COURT SITTING THEREIN AND CONSENTS TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT AND SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON BORROWER BY MAIL AT THE ADDRESS FOR NOTICE SET FORTH IN THIS AGREEMENT. BORROWER HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT FORUM.**

7.16     The parties intend this Agreement to be the final, complete and exclusive statement of the transactions evidenced by this Agreement.  All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superceded by this Agreement, and no party is relying on any promise, agreement or understanding not set forth in this Agreement. This Agreement may not be amended or modified except by a written instrument describing such amendment or modification executed by Borrower and Lender.

7.17     No portion of the proceeds of the Loan or Project Loan shall be used, in whole or in part, for the purpose of purchasing or carrying any "margin stock" as such term is defined in Regulation U of the Board of Governors of the Federal Reserve System.

7.18       In the event the Lender shall have determined that any requirement of any law of the United States of America, any regulation, order, interpretation, ruling, official directive or guideline adopted after the date hereof (whether or not having the force of law) of the Board of Governors of the Federal Reserve System, the Comptroller of the Currency, the Federal Deposit Insurance Corporation or any other board or governmental or administrative agency of the United States of America which shall impose, increase, modify or make applicable to the Note or this Agreement or cause the Note or this Agreement to be included in any reserve, special deposit, calculation used in the computation of regulatory capital standards, assessment or other requirement which imposes on the Lender any cost that is attributable to the maintenance thereof, then, and in each such event, the Borrower shall promptly pay the Lender, upon its demand, such amount as will compensate the Lender for any such cost, which determination may be based upon the Lender's reasonable allocation of the aggregate of such costs resulting from such events. In the event any such cost is a continuing cost, a fee payable to the Lender may be imposed upon the Borrower periodically for so long as any such cost is deemed applicable by the Lender, in an amount determined by the Lender to be necessary to compensate the Lender for any such cost, which determination may be based upon the Lender's reasonable allocation of the aggregate of such costs resulting from such events. The determination by the Lender of the existence and amount of any such costs shall, in the absence of manifest error, be conclusive. This Section 7.18 shall be available to Lender regardless of any possible contention of invalidity or inapplicability of the law, regulation or condition which shall have been imposed.

7.19       This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall together constitute one and the same instrument.

7.20       The Borrower acknowledges that (i) the Construction Consultant has been retained by the Lender to act as a consultant and only as a consultant to the Lender in connection with the Improvements, (ii) the Construction Consultant shall in no event or under any circumstance have any power or authority to make any decision or to give any approval or consent or to do any other act or thing that is binding upon the Borrower or the Lender, and any such purported decision, approval, consent, act or thing by the Construction Consultant on behalf of the Borrower or the Lender shall be void and of no force or effect, (iii) the Lender reserves the right to make any and all decisions required to be made by the Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by the Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by the Lender under this Agreement without in any instance being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant to the Lender or any other person with respect thereto, (iv) the Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to the Lender or any other person or party, and (v) the Lender reserves the right in its sole and absolute discretion to replace the Construction Consultant with another construction consultant at any time and without approval by or prior (but with subsequent) notice to the Borrower; provided that in the event the Lender elects to replace

the Construction Consultant, the Lender shall use all reasonable efforts to select a replacement Construction Consultant at a reasonable cost.

7.21     All payments due hereunder and under the Note, the Mortgage or any other Loan Document shall be made by Borrower in lawful money of the United States in immediately available funds.

7.22     This Agreement and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York (without giving effect to New York's principles of conflicts of law). Borrower and Lender hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or Federal court sitting in The City of New York (or any county in New York State where any portion of the Mortgaged Property is located) over any suit, action or proceeding arising out of or relating to this Agreement, and Borrower hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in The City of New York (or such other county in New York State) may be made by notice to Borrower, as provided in Section 7.01(i) of this Agreement.

7.23     Until the obligations of Borrower hereunder have been indefeasibly paid to the Lender in cash and all obligations of the Lender under this Agreement and the other Loan Documents have terminated, Borrower shall observe and comply with the following covenants:

(a)     Borrower shall limit the nature, purpose and conduct of its business to engage solely in the following activities:

(i)     To construct, own, hold, sell, assign, transfer, operate, lease, mortgage, pledge and otherwise deal with the Premises and the Improvements as contemplated hereby; and

(ii)     To exercise all powers enumerated in the applicable law pursuant to which Borrower was formed necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein and for no other purpose.

(b)     The Borrower shall only incur indebtedness in an amount necessary to construct, operate and maintain the Improvements. For so long as any obligations of Borrower under this Agreement remain unpaid and the liens and security interests of the Mortgage exist on any portion of the Premises, the Borrower shall not (i) incur, assume, or guaranty any other indebtedness, other than (w) the Loan and Project Loan, (x) trade payables or accrued expenses incurred in the ordinary course of business of owning and operating the Premises and due and payable within thirty (30) days, and (y) financing for furniture, fixture and equipment that has been approved by the Lender in advance, and (z) contributions made by a member of Borrower to Borrower and treated on the books of Borrower as loans but provided same shall be unsecured loans and repayment shall be subordinate to repayment of the Loan and Project Loan, (ii) grant any lien(s) or security interest(s) in the Premises other than to the Lender, (iii) dissolve or liquidate, or consolidate or merge with or into any other entity, or convey or transfer its properties and assets substantially as an entirety or transfer any of its beneficial interests to any

entity, (iv) voluntarily commence a case with respect to itself, as debtor, under the Federal Bankruptcy Code or any similar federal or state statute without the unanimous consent of all of the shareholders of Borrower, or (v) make any material amendment to its articles of incorporation or by-laws without first obtaining approval of the Lender.

        (c)    The Borrower shall conduct its affairs in accordance with the following provisions:

      (i)    It shall maintain records and books of account separate from those of any member or affiliate.

      (ii)    When applicable, its board of managers shall hold appropriate meetings (or act by written consent) to authorize all appropriate company action.

      (iii)    It shall observe all corporate formalities.

      (iv)    It shall not commingle assets, including without limitation bank accounts, with those of any member or affiliate.

      (v)    It shall hold all of its assets and conduct all of its business in its own name, and not that of any member or affiliate.

      (vi)    It shall maintain financial statements separate from any member or affiliate.

      (vii)    It shall pay any liabilities out of its own funds, including salaries of any employees, not funds of any member or affiliate.

      (viii)    It shall maintain an arm's length relationship with any member or affiliate and shall conduct any business with any member or affiliate pursuant to written agreements.

      (ix)    It shall not guarantee or become obligated for the debts of any other entity, including any member or affiliate, or hold out its credit as being available to satisfy the obligations of others.

      (x)    It shall use stationery, invoices and checks separate from any member or affiliate.

      (xi)    It shall not pledge its assets for the benefit of any other entity, including any member or affiliate.

      (xii)    It shall hold itself out as an entity separate from any member or affiliate.

(xiii)   It shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of contemplated business operations.

For purpose of foregoing, the following terms shall have the following meanings:

"affiliate" means any Person controlling or controlled by or under common control with Borrower including, without limitation (1) any Person who has a familial relationship, by blood, marriage or otherwise with any partner or employee of Borrower, or any affiliate thereof and (2) any Person which receives compensation for administrative, legal or accounting services from Borrower, or any affiliate. For purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

## ARTICLE 8

### Particular Provisions

The foregoing Articles of this Agreement are subject to the following further provisions:

8.01      Borrower shall cause the General Contractor to deposit all sums received from proceeds of the Loan into a separate demand deposit account at Lender and to only make withdrawals from such account to pay for the "cost of improvement" as such term is defined in the Lien Law.

8.02      The General Contractor Security shall be held by Lender until Completion of the Project.

8.03      Borrower and Lender agree that Borrower shall have the right to one six (6) month extension of the Maturity Date provided that (i) no Event of Default exists or any condition or event exists which with the passage of time, notice or both would constitute an Event of Default under this Agreement or the Mortgage; (ii) not less than thirty (30) days prior to the Maturity Date, the Borrower submits to Lender a written request for an extension; (iii) each Guarantor reaffirms in writing their obligations under the Guaranty and the Indemnity; (iv) the Borrower enters into note extension agreements with Lender, in form and substance satisfactory to Lender; (v) the Borrower pays the reasonable legal fees and expenses of Lender's Counsel in connection with the preparation and execution of such documentation; (vi) Lender has determined that the remaining unadvanced interest reserve in the Loan Budget Amounts is sufficient to pay the interest which will accrue under the Loan and Project Loan during the term of such extension; and (vii) a temporary certificate of occupancy has been issued for the Improvements.

8.04  (1)      The Borrower agrees, represents, warrants and covenants as follows:

(a)      (i) it will submit to Lender the Declaration for the conversion of the Improvements to a condominium regime on or before the Closing Date, (ii) it will submit to the New York State Department of Law (**"Department of Law"**) the Declaration (as approved by Lender) on or before the Closing Date, (iii) on or before the Closing Date, it will obtain a **"No Action"** letter from the Department of Law in accordance with the procedures and policies promulgated by the Department of Law pursuant to the New York General Business Law Article 23-A (the **"Martin Act"**) with respect to the conversion of the Real Property to the Condominium, (iv) on or before the Closing Date it will satisfy all of the requirements of and be sure that the Declaration complies with all of the applicable provisions of the Condominium Act, General Business Law of New York and any other applicable law, restriction, rule or ordinance necessary to create the Condominium and the Declaration shall be recorded in the Office of the City Register, Kings County;

(b)      it will comply with all of the provisions of the applicable condominium laws and/or statutes of the State of New York and/or any subdivision thereof, including, without limitation, the City of New York, and all other Governmental Authorities, and of the

Condominium Documents, the Condominium Act, the Martin Act and the Rules and Regulations, all as may be amended from time to time, as well as with the terms and conditions of the No-Action Letter for the Premises;

        (c)     it will duly perform, or caused to be performed, all obligations of the declarant or sponsor under the Condominium Documents, and do or cause to be done all things necessary to operate and maintain the Premises as a condominium project and will comply with the statutes, rules and regulations, including securities regulations, of all Governmental Authorities and will furnish such evidence of compliance therewith as Lender may request;

        (d)     Borrower shall comply with all provisions of the Declaration and No-Action Letter and, inter alia, appoint Lender as a proxy of Borrower if so required by Lender upon the occurrence of an Event of Default;

        (e)     Borrower shall deliver to Lender on the Closing Date, conditional letters of resignation from all the managers, members, officers and directors of the Condominium board of managers, association or corporation created pursuant to the Declaration for the Condominium; and

        (f)     Borrower shall deliver to Lender on the Closing Date, a subordination of any management agreement executed by the entity employed by said association or corporation to provide management services.

        (2)     All capitalized terms and phrases used but not defined in this Section 8.04(2) shall have the meaning ascribed thereto in the Declaration (including any exhibits attached thereto):

        (a)     With respect to the Declaration, Borrower covenants and agrees that it shall

            (i)     cause any member appointed by it to or serving at its request on the Condominium Board to confer with Lender in connection with the preparation of the budget and establishment of Common Charges to meet Common Expenses, and shall obtain Lender's consent prior to permitting such member to vote in favor of establishing any such charges;

            (ii)     provide to Lender upon receipt the report referred to in and issued pursuant to Section 5.15(b) of Exhibit D to the Declaration;

            (iii)     cause any member appointed by it to or serving at its request on the Condominium Board to appoint Lender as the Insurance Trustee upon the resignation of HDC from such position or if HDC is no longer a Lien Holder or holder of a Permitted Mortgage; and

            (iv)     cause any member appointed by it or serving at its request on the Condominium Board to designate Lender as the depository of any

accounts opened or maintained pursuant to Section 2.4(a)(vii) of Exhibit D to the Declaration.

(b)     With respect to the Declaration, Borrower covenants and agrees that it shall not, without the prior written consent of Lender:

     (i)  appoint, terminate or replace any member of the Condominium Board;

     (ii)  permit any member of the Condominium Board appointed by it or serving at its request to exercise any vote with respect to the matters covered by Sections 2.4(ii, iv, v, vi, x, xi, xiii, xv, xvii and xviii); 2.6(c); 3.6; 3.7; 3.8; 5.2; 5.11; 6.1; 12.1 of Exhibit D to the Declaration and Sections 10.4 and 12.1 of the Declaration; or

     (iii)  permit any member of the Condominium Board appointed by it or serving at its request to (a) vote to retain a managing agent, or (b) resign.

8.05  If Borrower elects to have Lender make the Lender's Permanent Loan, Borrower shall give Lender sixty (60) days notice prior to the Maturity Date of its election to convert the Loan and Project Loan to the Lender's Permanent Loan.  Borrower acknowledges and agrees that Lender shall not be obligated to convert the Loan and Project Loan to the Lender's Permanent Loan and extend the Maturity Date of the Note:

(a)     unless and until the Lender has received a note extension, consolidation and modification agreement and a mortgage consolidation and modification agreement, both in Proper Form, and payment of Lender's counsel's legal fees for the preparation of such documentation;

(b)     if any Event of Default or any event which with notice, the passage of time or both would become an Event of Default has occurred and is continuing;

(c)     unless and until all conditions of the Lender making the last advance of the Loan have been fully satisfied;

(d)     unless and until the Lender's Permanent Loan Fee has been paid to Lender;

(e)     unless and until the Lender has received (i) a temporary certificate of occupancy with no punchlist items outstanding or a permanent certificate of occupancy, (ii) evidence satisfactory to Lender that there are no building code or other municipal violations on the Premises or Improvements and (iii) evidence satisfactory to Lender that Improvements have been completed free of unbonded liens;

(f)     unless and until Lender receives evidence that the Borrower has paid the Lender's Counsel's fees and the Construction Consultant's fees;

(g)     unless and until the Lender and HDC receive certifications from the Borrower's Architect, Construction Consultant and the General Contractor, satisfactory to the Lender, that the Improvements have been completed substantially in accordance with the Plans and comply with all zoning laws, rules and ordinances and all covenants and restrictions affecting the Premises;

(h)     unless and until Lender receives a reaffirmation of the Environmental Indemnity by the Borrower or a new indemnity in Proper Form;

(i)     unless and until Lender has received evidence satisfactory to it in its sole discretion of a DSCR of not less than the Minimum DSCR set forth on Exhibit G attached hereto;

(j)     unless and until the Lender has received an update of the appraisal, if Borrower has elected to obtain such an appraisal, delivered to Lender in connection with the closing of the Loan or another appraisal in form and substance satisfactory to the Lender, and from an appraiser satisfactory to Lender, and Lender makes a determination in its sole and absolute discretion that the Permanent Loan Amount is not more than 75% of the value of the Improvements upon stabilization;

(k)     unless and until Lender receives a certified rent roll for the Improvements and certified copies of all leases for the Improvements, which shall all be subject and subordinate to the mortgage securing the Lender's Permanent Loan in a manner satisfactory to Lender;

(l)     Borrower has obtained and delivered to Lender final certificates of eligibility for the Real Estate Tax Abatement; and

(m)     Lender's credit facility with respect to the Related Project has been retired and paid in full and its letter of credit with respect thereto returned to Lender.

8.06     Lender and Borrower acknowledge and agree that (a) the Lender hereby agrees to convert the Loan and the Project Loan to the Lender's Permanent Loan concurrently with the satisfaction of all of the conditions of items (a) to (m) of Section 8.05 above, (b) if at any time the then outstanding amount of the Loan and the Project Loan, together with any and all other amounts owed by Borrower under the Loan Documents are not paid in full prior to the Maturity Date, then there shall be no Conversion Date or Lender's Permanent Loan, and (c) the Borrower's failure or inability to cause the  Conversion Date to occur shall not extend the Maturity Date and/or otherwise excuse, waive, modify and/or terminate any one or more of the Borrower's obligations under the Note or other Loan Documents.

8.07     Notwithstanding anything to the contrary in this Agreement, Lender shall not be obligated to make any further advances of the Loan or Project Loan (a) after the Conversion Date and/or (b) after the then outstanding amount of the Loan or Project Loan, together with any and all other amounts owed by Borrower under the Note, the Mortgage and this Agreement, are paid in full.

8.08       If Borrower elects to have Lender make the Lender's Permanent Loan, then the Lender's Permanent Loan documents shall be on the Lender's Permanent Loan Terms and shall provide, inter alia, for the following items and conditions:

(a)       Borrower agrees that the amount of the Lender's Permanent Loan shall be equal to the lesser of (i) the Permanent Loan Amount, (ii) LTV or (iii) the amount supported by the Minimum DSCR set forth on Exhibit G attached hereto;

(b)       otherwise be in Lender's then current form of documentation for similar loans, and contain, inter alia, covenants similar to those in Section 8.04 (2) of this Agreement and provide for the notification to the Condominium Board that Lender is a Permitted Mortgagee as set forth in the Declaration;

(c)       a covenant that the Borrower maintain at all times from and after the Conversion Date a DSCR of not less than the Minimum DSCR, which DSCR shall be tested annually;

(d)       at Borrower's option, an appraisal of the Premises and Improvements satisfactory to Lender in its sole discretion, and showing the LTV;

(e)       a covenant that the Borrower shall maintain with the Lender all operating accounts, reserve accounts and security deposit accounts with respect to the Improvement during the term of the Lender's Permanent Loan;

(f)       the requirement that the Borrower deliver to the Lender a certified rent roll for the Improvements on an annual basis; and

(g)       a covenant that Borrower shall establish an account with Lender and shall allow Lender to debit from such account the monthly debt service amount and any other monthly payments due and owing on the Lender's Permanent Loan.

8.09       If Borrower does not elect to have Lender provide Lender's Permanent Loan, then Borrower shall pay to Lender a fee equal to one percent (1%) of the maximum principal amount of the Loan (whether or not it is fully advanced) prior to release of the Mortgage.

8.10       Borrower further covenants and agrees that if it is unable to comply with the terms of Sections 805, 8.06 and 8.08 hereof, Borrower shall repay the Loan and the Project Loan on or before the Maturity Date.

8.11       Borrower acknowledges and agrees that Lender shall have a right to do an appraisal at Borrower's cost and determine the LTV if a default occurs and is continuing hereunder.

8.12       Borrower shall enter into an agreement with a commercial real estate leasing broker licensed in the State of New York for the marketing of the Premises within 90 days of the Closing Date. Such agreement shall be subject and subordinate to the Mortgage, shall not be binding on Lender or the Premises and shall be subject to the Lender's prior

approval. Borrower shall have the Premises leased in full no less than 18 months from the Closing Date with a lease or leases providing the Minimum DSCR. All leases to be subject to Bank's prior review and approval in Proper Form and subject and subordinate to the Mortgage.

        8.13        Lender shall not be required to close Lender's Permanent Loan if there has been any material adverse change in Borrower's or Individual Guarantor's financial condition since the Closing Date, as determined by Lender in its sole discretion.

        8.14        Evidence of Borrower's qualification for the RE Tax Abatement shall be provided to Lender no later than thirty (30) days after the Completion Date. In no event shall Lender be required to make the last advance of the Loan pursuant to this Agreement until Borrower has delivered a preliminary certificate of eligibility for the RE Tax Abatement or such other evidence satisfactory in all respects to Lender of such eligibility. Borrower shall deliver to Lender, not later than sixty (60) days after the Completion Date, a final certificate of eligibility for the RE Tax Abatement. Borrower shall take all actions required in order to maintain the availability of the RE Tax Abatement.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the day and year first above written, the execution hereof by Borrower constituting (a) a certification by the party or parties executing on its behalf that the representations and warranties made in Article 5 are true and correct as of the date hereof and that each of them duly holds and is incumbent in the position indicated under his name, and (b) the undertaking of said party or parties that each Requisition, whether or not personally made by any or all of them, shall constitute the personal affirmation on the part of each of them that at the time thereof said representations and warranties are true and correct.

**BANCO POPULAR NORTH AMERICA**

By:_____

     Lawrence G. Hammond
     Vice President


**RIVERROCK NEHEMIAH REALTY LLC,**
a New York limited liability company


By:    Guytech Management Services, Inc.


By:_____

     Joseph Norton
     President

STATE OF NEW YORK      )
                       :  ss.:
COUNTY OF NEW YORK )

On the 20th day of August in the year 2008, before me, the undersigned, a notary public in and for said state, personally appeared **Lawrence G. Hammond**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public
Commission Expires:

MICHAEL SCHWARTZ
Notary Public, State of New York
No. 01SC6096514
Qualified in Kings County
Commission Expires July 28, 2011

STATE OF NEW YORK      )
                       :  ss.:
COUNTY OF NEW YORK )

On the 20th day of August in the year 2008, before me, the undersigned, a notary public in and for said state, personally appeared **Joseph Norton**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public
Commission Expires:

MICHAEL SCHWARTZ
Notary Public, State of New York
No. 01SC6096514
Qualified in Kings County
Commission Expires July 28, 2011

# **SCHEDULE A**

Legal Description of the Premises

# FIRST NATIONWIDE OF NY, INC.

### as Agent for
### Old Republic National Title Insurance Company

### LOAN POLICY
### SCHEDULE A DESCRIPTION

Title Number:  **FNO-15339-KF**                              Policy Number: **LX380166**

**ALL that certain piece or parcel or real property, with the improvements therein contained, situate and being a part of a condominium in the Borough of Brooklyn, County of Kings, City and State of New York, known and designated as Residential Unit No. 1001 together with an undivided 5 % interest in the Common Elements of the condominium hereinafter described as the same is defined in the Declaration of Condominium hereinafter referred to.**

**The real property above described is a Unit shown on the plans of a condominium prepared and certified by Danios Architects, P.C. , and filed in the Office of the Register of the City of New York, Kings County, on 9/26/08, as Map No. 2262, as defined in the Declaration of Condominium entitled The River Rock Condominium, made by River Rock Housing Development Fund Company, Inc under Article 9-B of the New York Real Property Law dated 8/20/08, and recorded in the Office of the Register of the City of New York, Kings County, on the 26th day of September 2008, in File #2008000383142, covering the property therein described.**

**Premises designated as Block 3602 Lot 1002.**

NOTE: Lot and Block shown for informational purposes only.

## **SCHEDULE B**

Legal Description of Real Property

## EXHIBIT A

### N.Y. Lien Law Statement

STATE OF NEW YORK    )
                           : ss.:
COUNTY OF NEW YORK  )

        The undersigned, being duly sworn, deposes and says that:

       (1)      He resides at the address shown at the foot hereof and holds the office in Borrower indicated beneath his signature.

| | | |
|---|---|---|
| (2) | The amount of the Loan is: | $1,912,341 |
| (3) | The consideration for the Loan to be paid and the other expenses heretofore incurred or to be incurred in connection with and paid out of the Loan are (or are estimated to be) as follows: | |

| | |
|---|---|
| The Commitment fee, for the Loan: | $19,227.00 |
| Appraisal: | $754.00 |
| Fees of Lender's Construction Consultant: | $117.00 |
| Fees of Lender's Counsel: | $25,000.00 |
| Architect's Fees: | $16,335.00 |
| Insurance and Taxes: | $25,945.00 |
| Title and Recording Charges: | $4,527.40 |
| Mortgage Recording Tax | $63,336.00 |
| Environmental | $149.00 |
| Total | $155,390.40 |

| | | |
|---|---|---|
| (4) | The amount, if any, to be advanced from the Loan to repay amounts previously advanced to the Borrower pursuant to Notices of Lending for costs of the Improvements is: | $-0- |
| (5) | The amount, if any, to be advanced from the Loan to reimburse the Borrower for costs of the Improvements expended by the Borrower after the commencement of the Improvements but prior to the date hereof for: | $-0- |

E-A-1

(6)     The estimated amount to be advanced from the Loan for indirect costs of the Improvements which may become due and payable after the date hereof and during the construction of the Improvements (such as bond and insurance premiums, fees of architects, engineers and surveyors, ground rents, taxes, assessments and water and sewer rents, fees to obtain the Permanent Loan and interest on the Loan) is:     $40,443.60

(7)     The net sum available to Borrower from the Loan to pay contractors, subcontractors, laborers and materialmen for the Improvements is:     $1,716,507.00

(8)     This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York.

(9)     If the Borrower is a corporation or partnership, this statement is verified by deponent and not by Borrower because Borrower is a corporation or partnership of which the deponent is an officer or general partner.

E-A-2

(10)   The facts stated above and any costs itemized on this statement are true, to the best knowledge of the undersigned.

Sworn to before me this
20th day of August, 2008

_____
Notary Public

**MICHAEL SCHWARTZ**
Notary Public, State of New York
No. 01SC6096514
Qualified in Kings County
Commission Expires July 28, 2011

_____
Joseph Norton
Member

having an address at:

c/o River Rock Nehemiah Realty LLC
771 Thomas S. Boyland Street
Brooklyn, New York 11212

E-A-3

## EXHIBIT B

### (Letter of Borrower's Architect)

### [ DATE ]

Banco Popular North America
120 Broadway, 16th Floor
New York, New York 10036

      Re:    Premises:

             Project:

             Borrower:

Ladies and Gentlemen:

        We are the Architects for the Improvements.  In consideration of your loan to the Borrower, made to finance the construction of the Improvements, we agree that, in the event of default by the Borrower under any of the loan documents, we shall, at your request, continue performance under our agreement with the Borrower on your behalf, provided that we shall be reimbursed in accordance with the terms of said agreement for all services rendered on your behalf.

        You shall be entitled to use the plans, specifications and drawings, together with any and all modifications thereof, prepared for the Improvements, including any additions, enlargements or extensions thereof without cost to you.

        We warrant and represent to you that the Improvements, when completed in accordance with the plans and specifications, (i) will comply with all applicable zoning ordinances, governmental regulations and restrictive covenants affecting the Premises, and (ii) will have access to telephone, gas, electrical, sewer and public water services. No portion of the Premises contains any wetlands area or tidal wetland area, as those terms are defined by the New York State Department of Environmental Conservation).

                      Very truly yours,

                      By:_____

E-B-1

## EXHIBIT C

### (Contractor's Letter Head)

### [ DATE ]

Banco Popular North America
120 Broadway, 16th Floor
New York, New York 10036
Attention: Lawrence G. Hammond

      Re:    Premises:

               Project:

               Borrower:

               Change Order:    Any amendment or modification to the Plus, the Contract or any Subcontract

               Change Order
               Amount:    $10,000

               Aggregate
               Change Order
               Amount:    $10,000

Ladies and Gentlemen:

      We are a Contractor for the Project pursuant to a written agreement with Borrower or the General Contractor. In consideration of your loan to the Borrower made to finance the Project, we agree that in the event that you advise us of a default by the Borrower under any of the loan documents, we shall, at your request, continue performance under our agreement with the Borrower or General Contractor on your behalf, provided that we shall first be paid for all work performed up to the date you take over and continue to be paid in accordance with the terms of said agreement for all work, labor and materials rendered on your behalf. Notwithstanding the above, we understand that we shall not be reimbursed for any work performed, the cost of which has been previously requisitioned by the Borrower and paid for out of the proceeds of the Loan.

      We further agree that we shall not perform work pursuant to any Change Order which will result in a change in the contract price set forth in said agreement in excess of the Change Order Amount, nor pursuant to any such Change Order which, together with the aggregate of Change Orders theretofore executed between the Borrower and us, excluding those theretofore expressly approved by you in writing, will result in an increase or decrease in such price in excess of the Aggregate Change Order Amount, unless in either case we shall have

E-C-1

received your express written approval of such Change Order. In the event we fail to secure your specific approval of such Change Order, we shall deem said agreement to be unmodified by such Change Order.

We hereby covenant and agree that, in the event any of the proceeds of said loan are disbursed directly to us, we will receive any such advances and will hold the right to receive the same as a trust fund for the purpose of paying the costs of the Project, and we will apply the same first to such payment before using any part thereof for any other purpose.

The officer executing this instrument on behalf of the undersigned, hereby personally certifies that the undersigned Contractor has full authority and is properly licensed, under all state or local laws and regulations, to perform its obligations in accordance with the terms thereof.

Very truly yours,

**[general contractor's name]**

By: _____
      Name:
      Title:

E-C-2

## EXHIBIT D

### (Pending Disbursements Clause)

Pending disbursement of the full proceeds of the loan secured by the insured mortgage or deed of trust described herein, this policy insures only to the extent of the amount actually disbursed plus interest accrued thereon but increases up to the face amount of the policy as disbursements are made in good faith and without knowledge of any defects in, or encumbrances prior to, the lien of the insured mortgage or deed of trust other than exceptions on Schedule B of this policy not insured against hereunder.

Title shall be continued down to the date of each disbursement and the Company shall furnish to the Insured a continuation report which shall note (1) the new effective date and amount of the policy, (2) all assessments, taxes, liens, encumbrances, leases, mortgages, easements and other items including survey variations, encroachments and setback violations then affecting the insured premises which have been filed of record or discovered by the Company since the original date of the policy regardless of whether they affect the lien of the insured mortgage or deed of trust, (3) which of the aforesaid items have been filed or recorded since the date of the last preceding continuation report, and (4) which said items are intended to be added as exceptions to the coverage of the policy as to (a) all amounts secured by the insured mortgage or deed of trust and (b) only amounts secured by the insured mortgage or deed of trust advanced on or after the new effective date of the policy.

In addition, each continuation search will notify Lender of any liens which have been discharged by bonding, court deposit or any other means other than full payment.

In the event that the lien of the insured mortgage or deed of trust described herein is insured by more than one insurer, this Company agrees that it shall be bound by the continuation reports of a single company specified as "lead" insurer herein.

E-D-1

## EXHIBIT E

Borrower's Requisition

REQUISITION NO. _____

TO BANCO POPULAR NORTH AMERICA.        ("LENDER"):

Date: _____        Borrower: _____

Period Covered _____        Premises: _____

To _____        Retainage Percentage _____%

BLTA No.: _____        Loan No.: _____

Pursuant to the Building Loan Agreement ("BLA") for the subject Loan, Borrower hereby authorizes and requests an advance to its Building Loan Trust Account having the BLTA No. in the amount of $_____ which is calculated as follows:

| | | |
|---|---|---|
| (1) | Direct Costs incurred to the end of the Period Covered (from SCHEDULES I AND I-A hereto): | $_____ |
| (2) | Less the greater of -- (a)  Retained Amounts or of said costs: $_____ (b)  Retained Amounts to the end of the Period Covered (from SCHEDULES I AND I-A hereto): | ___( )___        $_____ |
| (3) | Indirect Costs incurred to end of the Period Covered (from SCHEDULES II hereto): | _____ |
| (4) | Less portion of Loan Amount previously advanced: | _____ |
| (5) | Less amount previously requisitioned but not advanced pursuant to subparagraphs (c) + (d) of Section 2.01 of the BLA: | $_____        ___( )___ |
| (6) | Amount Requisitioned for the Period Covered (1-2+3-4-5): | $_____ |

E-E-1

REQUISITION NO.

1.   In connection with and in order to induce Lender to advance the amount requested above, Borrower hereby represents, warrants and stipulates as follows:

2.   The information stated above and the representations and warranties in <u>Section 5.01</u> of the BLA are true and correct as of the date of this Requisition and, unless Lender is notified to the contrary prior to the disbursement of the advance requested above, will be so on the date thereof.

3.   The amounts and percentages set forth on SCHEDULES I, I-A and II hereto are true and correct to the best of Borrower's knowledge.

4.   All sums previously requisitioned have been applied to the payment of the Direct and Indirect costs heretofore incurred, or such sums have been retained in the Building Loan Trust Account for such purpose and no other.

5.   Names, addresses, contract dates and amounts for the contractors, subcontractors, suppliers and materialmen responsible for performing each item of direct Cost listed on SCHEDULES I and I-A hereto have been heretofore or are herewith submitted to Lender and the construction consultant and copies of any Major Subcontracts not previously delivered to Lender or the construction Consultant are enclosed herewith.

6.   All Change Orders have been submitted to Lender and the Construction Consultant and all Change Orders for which an advance is requested hereby have been approved by Lender for funding.

7.   All Payment Receipts due in accordance with the terms of the BLA as of the end of the Period Covered have been submitted to the Construction Consultant.

Capitalized terms used herein not otherwise defined shall have the meanings ascribed to them in the BLA.

Subscribed and sworn to before          Very truly yours,
me on _____, 200_.


_____          (Borrower)
         Notary Public

         [Stamp and Seal]                 By_____

E-E-2

**EXHIBIT F**

<u>Lien Waiver</u>

(Form of payment receipt) (To be filled out on Contractor's letterhead)

To:  The Borrower and General Contractor named below and Banco Popular North America

Period Ending ("date") _____ , 200_

| Re: | Borrower: | |
|---|---|---|
| | Premise: | |
| | General Contractor: | |
| | Contract work: | |
| | Contract Date: | |
| | Original Contract Amount: | $ |
| | Change Orders: | $ |
| | Adjusted Contract Amount: | $ |
| | Amount of Work Performed to Date: | $ |
| | Retainage Amount Not Yet Due: | $ |
| | Net Amount Due To Date: | $ |
| | Total Payments Received to Date: | $ |

The undersigned contractor, subcontractor or supplier hereby acknowledges receipt of $_____ (in cash only and not in equivalents or other agreements) and aggregate payments equal to the Total Payments received to Date stated above. DOES HEREBY CERTIFY AND ACKNOWLEDGE that it has received all sums due and owing to it for work performed or materials supplied at or in connection with the Project to the date of all prior requisitions and DOES HEREBY FOREVER RELEASE AND WAIVE for itself, its successors and assigns (a) any and all rights, claims and demands it has or may have against the General Contractor or the Borrower identified above, and their respective successors and assigns (collectively, the "Released Parties") to the date of all prior requisitions : and (b) all right which it has or may have pursuant to the New York State Lien law to file any lien against the Project or any interest of any of the Released Parties therein or any other assets or interest of any of the Released Parties.

 The undersigned represents that it has fully paid all its subcontractors, laborers, materialmen and any other person retained or hired by the Company on or in connection with the Project to date (including without limitation all union benefits) and the undersigned agrees to indemnify and save and hold the Released Parties harmless from any and all claims and expenses, including attorney's fees that may be made by any of the undersigned's subcontractors, laborers, materialmen, for any damages, injury or liability arising from or in connection with the performance of the work or the furnishing of materials or any of its or their subcontractors, laborers, materialmen, agents, servants and employees in performance of the Subcontract or Purchase Order, or anywise in connection with any of the work performed or materials furnished

E-F-1

upon or in connection with the Project or any breach or default by the undersigned hereunder. In the event a lien is filed against the property in connection with the subcontractor's work, the undersigned agrees to immediately post a bond in satisfaction of the lien and to proceed to discharge the lien and/or satisfy any judgment or award rendered. Any or all of the Released Parties may at their option (i) post a bond, and discharge such lien (ii) defend any action related to lien, (iii) pay and satisfy any judgment or award and the undersigned shall be responsible for and pay such Released Parties all direct and indirect costs thereof, including attorney fees. The undersigned further stipulates that the signatory hereto is an authorized officer with full power to execute this waiver and release a claim.

Duly authorized, executed and delivered by the undersigned this _____ day of _____ 200_.

WITNESSED OR NOTARIZED BY:

(1)_____

_____
(Contractor, Subcontractor or Supplier)

(2)_____

By:_____

E-F-2

**EXHIBIT G**

**Lender's Permanent Loan Terms**

| | |
|---|---|
| Amount: | An amount not to exceed $2,262,010, subject to the condition set forth in <u>Sections 8.05</u>, <u>8.06</u> and <u>8.08</u>. |
| Term: | Ten (10) years. |
| Maximum Loan To Value: | The ratio and the amount of the Lender's Permanent Loan to the value of the Premises, as improved by the Improvements, not to exceed 75%. |
| Lien Priority: | Insured first lien, no other financing to be permitted without Lender's prior written consent. Title to be satisfactory to Lender. |
| Documentation: | Lender's standard documentation, which shall be in Proper Form, including, but not limited to a guaranty of payment. |
| Amortization: | Twenty-five (25) years. |
| Costs: | Lender's Counsel's costs fees and expenses to be paid by Borrower, as well as all costs in connection with closing the loan, such as title, survey and recording fees. |
| Conditions: | As set forth in <u>Sections 8.05</u>, <u>8.06</u> and <u>8.08</u> of this Agreement. |
| DSCR | The ratio of net operating income from the Premises and Improvements to the payments due on the Lender's Permanent Loan, as determined by Lender in its sole reasonable discretion. |
| Minimum DSCR | 1.20:1 |
| Interest Rate | Fixed rate equal to 6.75% per annum for the first five years of the term, and then adjusts to a fixed rate of interest equal to the then five-year United States Treasury Securities plus |

E-G-1

| | 2.50%, but not less than 6.50%. |
|---|---|
| Financial Reporting | As required by Lender. |
| Opinion of Counsel | In Proper Form opining as to the enforceability of the Loan Documents and Borrower's authority to execute, deliver and perform same. |
| Debt Service Reserve | An amount not less than $94,166 to be held by Lender in a blocked account controlled by Lender for up to 18 months after the Conversion Date, which may be used by Lender to pay debt service on Lender's Permanent Loan or to pay down the principal amount to achieve the Minimum DSCR, but which shall be considered advanced from Lender's Permanent Loan. |
| Guaranty | Unlimited payment guarantee by Joseph Norton. |
| Insurance | Borrower shall provide evidence of such insurance coverage as Lender shall require, including, without limitation, 2 years worth of business interruption insurance. |
| Condominium | Lender's permanent mortgage shall be permitted under the Condominium Documents and Lender receives an insurance certificate evidencing that it is an additional insured on the Condominium's insurance and it receives evidence in Proper Form that Borrower has paid all common charges payable by it. |
| Environmental | No change in the environmental condition of the Premises since the Closing Date. |

E-G-2

# EXHIBIT 2

# BUILDING LOAN NOTE

Date of Note:  As of August 20, 2008

Amount of Note:  $1,912,341

Maturity Date:  September 30, 2010

Interest Rate:  Base Rate or the Libor Rate, as set forth below, unless the Involuntary Rate (as herein defined) is applicable.

**FOR VALUE RECEIVED,** the undersigned, having an address as indicated under its name below (herein called the "**Borrower**"), **HEREBY PROMISES TO PAY ON THE MATURITY DATE,** to the order of **BANCO POPULAR NORTH AMERICA,** a New York banking corporation, its successors and/or assigns ("**Lender**") at its offices at 120 Broadway, 16th Floor, New York, New York 10271, or at such other place as the holder hereof may from time to time designate in writing, in lawful money of the United States, in immediately available New York funds, without counterclaim or setoff and free and clear of, and without deduction or withholding for, any taxes or other payments, the Amount of Note, or so much thereof as may be advanced by Lender, pursuant to that certain building loan agreement dated of even date herewith (the "**Building Loan Agreement**") between Borrower and Lender (the "**Principal Amount**"), together with interest on the Principal Amount or on so much thereof as may from time to time remain unpaid at the Interest Rate, or the Involuntary Rate (hereinafter defined), if applicable, which shall be computed on an actual 360-day basis (i.e., all computations of interest under this Note shall be made on the basis of a three hundred sixty (360) day year and the actual number of days elapsed). Interest shall be payable monthly on the first day of the first month following the first advance under the Building Loan Agreement and on the first day of each month thereafter until this Note is paid in full.

Interest Rates. The Principal Amount from day to day outstanding which is not past due shall bear interest at a rate per annum equal to the following (computed as provided below) as applicable:

(a)  On Base Rate Principal, on any day, the Base Rate; and

(b)  On LIBOR Rate Principal, for the applicable Interest Period, the applicable LIBOR Rate.

Interest Rate Elections.

(a)  Subject to the conditions and limitations in this Note, Borrower shall be deemed to (a "Rate Election Notice"):

(i)      Elect, for a new advance of funds, that such Principal Amount will be LIBOR Rate Principal unless it is not commercially feasible for Lender to provide the LIBOR Rate as hereinafter provided;

(ii)     Elect to convert, on a LIBOR Business Day, all or part of Base Rate Principal into LIBOR Rate Principal; or

(iii)    Elect to continue, commencing on the last day of the Interest Period applicable thereto, any LIBOR Rate Principal.

If, for any reason, an effective election is not made in accordance with the terms and conditions of this Note for any principal advance or for any LIBOR Rate Principal for which the corresponding Interest Period is expiring, or to convert Base Rate Principal to LIBOR Rate Principal, then the sums in question will be deemed to bear interest at the LIBOR Rate.

(b)     Each Rate Election Notice must be received by Lender not later than 10:00 a.m. on the applicable date as follows:

(i)      three (3) LIBOR Days prior to the proposed date of advance.

Unless otherwise specified herein, no conversion from LIBOR Rate Principal may be made other than at the end of the 'corresponding Interest Period. All such notices shall be irrevocable once given, and shall be deemed to have been given only when actually received by Lender in writing in a form specified by Lender.

General Conditions Precedent to LIBOR Rate Election. In addition to any other conditions herein, a LIBOR Rate Election shall not be permitted if:

(a)     After giving effect to the requested LIBOR Rate Election, the sum of all LIBOR Rate Principal plus all Base Rate Principal would exceed the principal face amount of this Note; or

(b)     Any of the circumstances referred to in the Section of this Note with a heading "Unavailability of Rate" below shall apply with respect to the requested LIBOR Rate Election or the requested LIBOR Rate Principal.

Determinations. Lender shall determine each interest rate applicable to the Principal Amount in accordance with this Note and its determination thereof shall be conclusive in the absence of manifest error. The books and records of Lender shall be conclusive evidence, in the absence of manifest error, of all sums owing to Lender from time to time under this Note, but the failure to record any such information shall not limit or affect the obligations of Borrower under the Loan Documents.

Unavailability of Rate. If, with respect to any LIBOR Rate Election, or any LIBOR Rate Principal outstanding hereunder, Lender determines that no adequate basis exists for determining the LIBOR Rate or that the LIBOR Rate will not adequately and fairly reflect the cost to Lender of funding or maintaining the applicable LIBOR Rate Principal for such Interest Period, or that

- 2 -

any applicable Law (hereinafter defined), or any request or directive (whether or not having the force of law) of any Tribunal (hereinafter defined), or compliance therewith by Lender, prohibits or restricts or makes impossible the making or maintaining of such LIBOR Rate Election or LIBOR Rate Principal or the charging of interest on such LIBOR Rate Principal, and Lender so notifies Borrower, then until Lender notifies Borrower that the circumstances giving rise to such suspension no longer exist, (a) the obligation of Lender to permit such LIBOR Rate Election shall be suspended and (b) all existing affected LIBOR Rate Principal shall automatically become Base Rate Principal, either (i) on the last day of the corresponding Interest Period (if Lender determines that it may lawfully continue to fund and maintain the affected LIBOR Rate Principal to such day); or (ii) immediately (if Lender determines that it may not lawfully continue to fund and maintain the affected LIBOR Rate Principal to such day) and in such case Borrower shall pay to Lender the Consequential Loss, if any, pursuant to the Section of this Note with a heading "Prepayment" below.

Increased Cost and Reduced Return.   If at any time after the date hereof, Lender (which shall include, for purposes of this paragraph, any corporation controlling Lender) determines that the adoption or modification of any applicable Law regarding taxation, Lender's required levels of reserves, deposits, insurance or capital (including any allocation of capital requirements or conditions), or similar requirements, or any interpretation or administration thereof by any Tribunal or compliance by Lender with any of such requirements, has or would have the effect of (a) increasing Lender's costs related to the Indebtedness, or (b) reducing the yield or rate of return of Lender on the Indebtedness, to a level below that which Lender could have achieved but for the adoption or modification of any such requirements, Borrower shall, within fifteen (15) days of any request by Lender, pay to Lender such additional amounts as (in Lender's sole judgment, after good faith and reasonable computation) will compensate Lender for such increase in costs or reduction in yield or rate of return of Lender.   No failure by Lender to immediately demand payment of any additional amounts payable hereunder shall constitute a waiver of Lender's right to demand payment of any such amounts at any subsequent time. Nothing herein contained shall be construed or shall so operate as to require Borrower to pay any interest, fees, costs or charges greater than is permitted by applicable Law.

Involuntary Rate.   If any amount payable by Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at the Involuntary Rate (as defined below) to the fullest extent permitted by applicable Law.   Accrued and unpaid interest or past due amounts (including interest on past due interest) shall be due and payable on demand, at a fluctuating rate per annum (the "**Involuntary Rate**") equal to the higher of (a) the Prime Rate plus five hundred (500) basis points, or (b) the Adjusted LIBOR Rate plus five hundred (500) basis points.

Additional Defined Terms.   In addition to other terms defined herein, as used herein the following terms shall have the meanings indicated, unless the context otherwise requires:

"Adjusted LIBOR Rate" means the quotient obtained by dividing (a) the applicable London Interbank Offered Rate by (b) 1.00 minus the LIBOR Reserve Percentage.

"Base Rate" means, on any day, a simple rate per annum equal to the sum of the Prime Rate for that day plus the Base Rate Margin. Without notice to Borrower or anyone else, the Base Rate shall automatically fluctuate upward and downward as and in the amount by which the Prime Rate fluctuates.

"Base Rate Margin" means five hundred (500) basis points.

"Base Rate Principal" means, at any time, the Principal Amount minus the portion, if any, of such Principal Amount which is LIBOR Rate Principal.

"Indebtedness" means any and all of the indebtedness to Lender evidenced, governed or secured by or arising under this Note or any other Loan Document.

"Interest Period" means with respect to any LIBOR Rate Principal, the period commencing on the date such LIBOR Rate Principal is disbursed or on the date on which the Principal Amount or any portion thereof is converted into or continued as such LIBOR Rate Principal, and ending on the date one (1) month thereafter; provided that:

(i) Each Interest Period must commence on a LIBOR Business Day;

(ii) In the case of the continuation of LIBOR Rate Principal, the Interest Period applicable after the continuation of such LIBOR Rate Principal shall commence on the last day of the preceding Interest Period;

(iii) The last day of each Interest Period and the actual number of days during the Interest Period shall be determined by Lender using the practices of the London Interbank market; and

(iv) No Interest Period shall extend beyond the Maturity Date, and any Interest Period which begins before the Maturity Date and would otherwise end after the Maturity Date shall instead end on the Maturity Date.

"Laws" means all constitutions, treaties, statutes, laws, ordinances, regulations, rules, orders, writs, injunctions, or decrees of the United States of America, any state or commonwealth, any municipality, any foreign country, any territory or possession, or any Tribunal.

"LIBOR Business Day" means a Business Day which is also a London Banking Day.

"LIBOR Margin" means two hundred fifteen (215) basis points.

"LIBOR Rate" means for any applicable Interest Period for any LIBOR Rate Principal, a simple rate per annum equal to the sum of the LIBOR Margin plus the Adjusted LIBOR Rate.

"LIBOR Rate Election" means an election or deemed election by Borrower of LIBOR Rate in accordance with this Note.

"LIBOR Rate Principal" means any portion of the Principal Amount which bears interest at an applicable LIBOR Rate at the time in question.

"LIBOR Reserve Percentage" means, with respect to any applicable Interest Period, for any day that percentage (expressed as a decimal) which is in effect on such day, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including basic, supplemental, emergency, special and marginal reserves) generally applicable to financial institutions regulated by the Federal Reserve Board comparable in size and type to Lender, in respect of "Eurocurrency liabilities" (or in respect of any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR Rate Principal is determined), whether or not Lender has any Eurocurrency liabilities or such requirement otherwise in fact applies to Lender.  The LIBOR Rate shall be adjusted automatically as of the effective date of each change in the LIBOR Reserve Percentage.

"London Banking Day" means a day on which banks in London are open for business and dealing in offshore dollars.

"London Interbank Offered Rate" means, with respect to any applicable Interest Period, the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as selected by Lender from time to time) at approximately 11:00 a.m. London time two (2) London Banking Days before the commencement of the Interest Period, for deposits in U.S. Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period.  If such rate is not available at such time for any reason, then the rate for that Interest Period will be determined by such alternate method as reasonably selected by Lender.

"Note" means this promissory note, and any renewals, extensions, amendments or supplements hereof.

"Potential Default" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Prime Rate" means, on any day, the rate of interest per annum then most recently established by Lender as its "prime rate," it being understood and agreed that such rate is set by Lender as a general reference rate of interest, taking into account such factors as Lender may deem appropriate, that it is not necessarily the lowest or best rate actually charged to any customer or a favored rate, that it may not correspond with future increases or decreases in interest rates charged by other lenders or market rates in general, and that Lender may make various business or other loans at rates of interest having no relationship to such rate.  If Lender (including any subsequent holder of this Note) ceases to exist or to establish or publish a prime rate from which the Prime Rate is then determined, the applicable variable rate from which the Prime Rate is determined thereafter shall be instead the prime rate reported in The Wall Street Journal (or the average prime rate if a high and a low prime rate are therein reported), and the Prime Rate shall change without notice with each change in such prime rate as of the date such change is reported.

"Tribunal" means any state, commonwealth, federal, foreign, territorial or other court or governmental department, commission, board, bureau, district, authority, agency, central bank, or instrumentality, or any arbitration authority.

Prepayment.

(a)     Borrower may prepay the principal balance of this Note, in full at any time or in part from time to time, provided that: (i) no prepayment may be made which in Lender's judgment would contravene or prejudice funding under any applicable permanent loan commitment or tri-party agreement or the like; (ii) Lender shall have actually received from Borrower prior irrevocable written notice (the "Prepayment Notice") of Borrower's intent to prepay, the amount of principal which will be prepaid (the "Prepaid Principal"), and the date on which the prepayment will be made; (iii) each prepayment shall be in the amount of $1,000 or larger; and (iv) each prepayment shall be in the amount of 100% of the Prepaid Principal, plus accrued unpaid interest thereon to the date of prepayment, plus any other sums which have become due to Lender under the Loan Documents on or before the date of prepayment but have not been paid; and (v) no portion of LIBOR Rate Principal may be prepaid except on the last day of the Interest Period applicable thereto, unless (X) the prior written consent of Lender is obtained which consent, if given, shall provide, without limitation, the manner and order in which the prepayment is to be applied to the Indebtedness, and (Y) Borrower pays to Lender any Consequential Loss as a result thereof, in accordance with Section 4(b) below. If this Note is prepaid in full, any commitment of Lender for further advances shall automatically terminate. No Prepaid Principal may be reborrowed.

(b)     Within fifteen (15) days after request by Lender (or at the time of any prepayment), Borrower shall pay to Lender such amount or amounts as will compensate Lender for any loss, cost, expense, penalty, claim or liability, including any loss incurred in obtaining, prepaying, liquidating or employing deposits or other funds from third parties and any loss of revenue, profit or yield, as determined by Lender in its judgment reasonably exercised (together, "Consequential Loss") incurred by Lender with respect to any LIBOR Rate, including any LIBOR Rate Election or LIBOR Rate Principal as a result of: (i) the failure of Borrower to make any payment on the date or in the amount specified in any Prepayment Notice from Borrower to Lender; (ii) the failure of Borrower to borrow, continue or convert into LIBOR Rate Principal on the date or in the amount specified in any Rate Election Notice or other notice given by Borrower to Lender; (iii) the early termination of any Interest Period for any reason; or (iv) the payment or prepayment of any amount on a date other than the date such amount is required or permitted to be paid or prepaid. Borrower agrees to pay all Consequential Loss upon any prepayment of LIBOR Rate Principal, whether voluntary or involuntary, whether effected by a credit bid at foreclosure, or whether by reason of acceleration upon an Event of Default or upon any transfer or conveyance of any right, title or interest in the Property giving Lender the right to accelerate the maturity of this Note as provided in the Mortgage. Notwithstanding the foregoing, the amount of the Consequential Loss shall never be less than zero or greater than is permitted by applicable Law. Lender shall provide a notice to Borrower setting forth Lender's determination of any Consequential Loss, which notice shall be conclusive and binding in the absence of manifest error. Lender reserves the right to provide interim calculations of such Consequential

Loss in any notice of default or notice of sale for information purposes, but the exact amount of such Consequential Loss shall be calculated only upon the actual prepayment of LIBOR Rate Principal as described herein. The Consequential Loss shall be included in the total indebtedness secured by the Mortgage for all purposes, including in connection with a foreclosure sale. Lender may include the amount of the Consequential Loss in any credit bid Lender may make at a foreclosure sale. Lender shall have no obligation to purchase, sell and/or match funds in connection with the funding or maintaining of the Loan or any portion thereof. The obligations of Borrower under this Section shall survive any termination of the Loan Documents and payment of this Note and shall not be waived by any delay by Lender in seeking such compensation.

This Note is secured by, *inter alia*, and the parties hereto are entitled to the benefits of that certain building loan mortgage, assignment of leases and rents and security agreement of even date herewith (which, as now exists, and as the same may hereafter, from time to time, be amended, modified, extended, consolidated, increased, supplemented, spread or restated is hereinafter referred to as the "**Mortgage**"), made by the Borrower to the Lender, encumbering, among other things, certain real property and improvements now or hereafter located on said real property and such other property and interests as more particularly described in the Mortgage (the "**Mortgaged Property**"), which Mortgage specifies various Events of Default upon the occurrence of any of such Events of Default, all sums due and owing on this Note may, at Lender's option, be declared immediately due and payable. This Note is executed and delivered pursuant to the Building Loan Agreement. All of the covenants, conditions and agreements of the Building Loan Agreement and the Mortgage, being made a part hereof by this reference.

Borrower acknowledges and agrees that Lender has no obligation to fund any advance under the Building Loan Agreement at any time after the Maturity Date.

Any payment made hereunder, whether categorized as a principal payment or otherwise, shall first be applied to the payment of costs and expenses for which Borrower is liable hereunder or under the Mortgage, next to the payment of accrued and unpaid interest, and lastly to a reduction of the Principal Amount.

All agreements between Borrower and Lender are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration or maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the indebtedness evidenced hereby exceed the maximum permissible under applicable law. As used herein, the term "applicable law" shall mean the law in effect as of the date hereof provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Note shall be governed by such new law as of its effective date. In this regard, it is expressly agreed that it is the intent of Borrower and Lender in the execution, delivery and acceptance of this Note to contract in strict compliance with the laws of the State of New York from time to time in effect. If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the loan documents which evidence and/or secure this Note at the time of performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from any circumstances whatsoever Lender should ever receive as interest an

amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest. This provision shall control every other provision of all agreements between Borrower and Lender.

Borrower promises to pay all costs, expenses and reasonable attorneys' fees incurred by the holder hereof in the exercise of any remedy (with or without litigation), in any proceeding for the collection of the debt evidenced by this Note, in any trustee's sale or foreclosure of the Mortgage or the realization upon any other security securing this Note, in protecting or sustaining the lien or priority of said Mortgage or said other security, or in any litigation or controversy arising from or connected with this Note, the Building Loan Agreement, or any security for or guaranty of this Note. Said proceedings shall include, without limitation, any probate, bankruptcy, receivership, injunction, arbitration, mediation, or other proceeding, or any appeal from or petition for review of any of the foregoing, in which the holder hereof appears to enforce the Building Loan Agreement, collect the debt evidenced by this Note or protect its security for this Note. Borrower shall also pay all of Lender's costs and reasonable attorneys' fees incurred in connection with any demand, workout, settlement, compromise or other activity in which Lender engages to collect any portion of the debt evidenced by this Note not paid when due or as a result of any default of Borrower. If a judgment is obtained hereon which includes an award of attorneys' fees, such attorneys' fees, costs and expenses shall be in such amount as the court shall deem reasonable, such judgment shall bear interest at the Involuntary Rate from the date it is rendered to and including the date of payment to Lender.

Borrower hereby waives valuation and appraisement, demand, presentment for payment, notice of dishonor, protest and notice of protest of this Note.

Any notice, demand or request relating to any matter set forth herein shall be in writing and shall be deemed effective and given as provided in the Mortgage.

This Note and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York (without giving effect to New York's principles of conflicts of law). Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the City of New York (or any county in New York State where any portion of the Mortgaged Property is located) over any suit, action or proceeding arising out of or relating to this Note, and Borrower hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in the City of New York (or such other county in New York State) may be made by notice to Borrower. Borrower hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum.

Borrower hereby agrees that it shall be bound by any agreement extending the time or modifying the above terms of payment, made by Lender and the owner or owners of the property affected by the Mortgage, whether with or without notice to Borrower, and Borrower shall continue to pay the amount due hereunder, but with interest at a rate no greater than the Interest

- 8 -

Rate (or the Involuntary Rate if otherwise applicable under this Note), according to the terms of any such agreements of extension or modification.

Time is of the essence as to all dates set forth herein, provided, however, that whenever any payment to be made under this Note shall be stated to be due on a Saturday, Sunday or a day which shall be in the State of New York a legal holiday or day on which banking institutions are required or authorized to close (any other day being a "**Business Day**"), such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in computing interest and fees in connection with such payment.

Borrower acknowledges that it has no offsets, defenses or counterclaims to the payment of this Note.

This Note and all documents executed in connection herewith have been reviewed and negotiated by Borrower and Lender at arms length with the benefit of the assistance of legal counsel and shall not be construed against either party.

This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

Borrower hereby, knowingly, voluntarily, intentionally, expressly and unconditionally waives, in connection with any suit, action or proceeding brought by Lender based upon, arising out of, under or in connection with this Note, or any other documents contemplated to be executed in connection herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party, any and every right it may have to (i) injunctive relief (other than injunctive relief granted in connection with any such suit, action or proceeding brought by Lender on this Note), (ii) interpose any counterclaim therein (other than a counterclaim brought under this Note that cannot be maintained in any separate action) and (iii) have the same consolidated with any other or separate suit, action or proceeding. Nothing herein contained shall prevent or prohibit Borrower from instituting or maintaining a separate action against Lender with respect to any asserted claim. Borrower acknowledges that the aforesaid waiver constitutes a material inducement for Lender to accept this Note and make the loan which is evidenced by this Note.

**BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN EVIDENCED BY THIS NOTE OR ENFORCEMENT OF THE LOAN DOCUMENTS EVIDENCING AND/OR SECURING THE LOAN, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A**

**JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS NOTE AND MAKE THE LOAN.**

Borrower hereby grants to Lender, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to Lender whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender or any entity under the control of Lender, or under common control or affiliated with Lender and its and their respective successors and/or assigns or in transit to any of them. At any time, without demand or notice (any such notice being expressly waived by Borrower), Lender may setoff the same or any part thereof and apply the same to any liability or obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral security for the loan which is evidenced by this Note. **ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN WHICH IS EVIDENCED BY THIS NOTE PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

Lender may at any time pledge or assign all or any portion of its rights under the loan documents which evidence and/or secure the loan evidenced by this Note, including any portion of this Note, to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or assignment or enforcement thereof shall release Lender from its obligations under any of the loan documents which evidence and/or secure the loan evidenced by this Note.

Should the indebtedness represented by this Note or any part thereof be collected at law or in equity, or in bankruptcy, receivership or any other court proceedings (whether at the trial or appellate level), or should this Note be placed in the hands of attorneys for collection upon default, Borrower agrees to pay, in addition to the principal, interest and other sums due and payable hereon, all costs of collecting or attempting to collect this Note, including attorneys' fees and expenses. After and during the continuance of any default hereunder or an "Event of Default", as that term is defined in the Mortgage, the rate of interest hereunder shall be the Involuntary Rate.

All payments due under this Note shall be made by Borrower to Lender at 120 Broadway, 16th Floor, New York, New York 10271 or such other place as Lender may from time to time specify in writing in lawful currency of the United States of America in immediately available

funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments.

If any section or provision of this Note is declared invalid or unenforceable by any court of competent jurisdiction, said determination shall not affect the validity or enforceability of the remaining terms hereof. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by the Lender and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the Lender, except to the extent actual cash proceeds of such instruments are unconditionally received by the Lender and applied to the indebtedness in the manner provided in this Note.

Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of this Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of this Note or other security document, Borrower will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

**IN WITNESS WHEREOF**, the Borrower has duly executed this Note as of the Date of Note.

**RIVERROCK NEHEMIAH REALTY LLC,**
a New York limited liability company

By:   Guytech Management Services, Inc.

By:_____
     Joseph Norton
     President

Having an address at:
771 Thomas S. Boyland Street
Brooklyn, New York 11212